In re WESTINGHOUSE ELECTRIC COR-
PORATICN URANIUM CONTRACTS
LITIGATION (In the United States Dis-
trict Court for the Eastern District of
Virginia) Ancillary Proceedings.

In the Matter of SUBPOENAS DUCES
TECUM addressed to Rio Algom Corpo-
ration by George R. Albino and Mervyn
Lawton.

No. 77–1382.

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted Aug. 3, 1977.

Decided Oct. 11, 1977.

Samuel A. Haubold of Kirkland & Ellis,
Chicago, Ill. (Joel R. Dangerfield of Mock,
Shearer & Carling, Salt Lake City, Utah, on

**994**

the brief), for Westinghouse Electric Corp., appellee.

Keith F. Bode of Jenner & Block, Chicago, Ill. (David S. Dolowitz and James B. Lee of Parsons, Behle & Latimer, Salt Lake City, Utah, and Albert E. Jenner, Jr., Anton J. Valukas, Barry Sullivan and Don R. Sampen of Jenner & Block, Chicago, Ill., on the brief), for Rio Algom Corp., appellant.

Before McWILLIAMS, BARRETT and DOYLE, Circuit Judges.

McWILLIAMS, Circuit Judge.

Rio Algom Corporation appeals from an order adjudging it, and its president, George R. Albino, to be in willful and inexcusable civil contempt of court for failing to comply with a discovery order of the United States District Court for the District of Utah, Central Division. Rio Algom was ordered to pay into the registry of the court the sum of $10,000, per day, until such time as Rio Algom complied with the order. It was further provided that should Rio Algom fail to pay the ordered fine, the United States Marshal was authorized and directed to enter upon the property of Rio Algom at La Sal, Utah and seize "any and all property of Rio Algom of sufficient value to satisfy the above sums." Our study of the matter leads us to conclude that the trial court erred in holding Rio Algom in contempt and in imposing the severe sanction in connection therewith. We therefore reverse.

Westinghouse Electric Corporation is the defendant in a civil action brought by several utility companies in the United States District Court for the Eastern District of Virginia. The action is essentially one for breach of contract, with the utility companies alleging that Westinghouse breached its contract to deliver uranium at a certain price. One of Westinghouse's defenses in the Virginia proceeding is that performance has been rendered "commercially impracticable" within the meaning of the Uniform Commercial Code because of a dramatic, unprecedented, and unforeseeable rise in the price of uranium. In connection with the defense of impracticability of performance, a major issue is whether the 800% increase in the price of uranium, from $5 per pound to $40 per pound, was caused by secret price fixing engaged in by various producers of uranium, both within and without the United States.

Rio Algom Corporation is a Delaware corporation and it operates a uranium mine in Utah. However, Rio Algom Corporation maintains its corporate office in Canada, and it is this fact which triggers the present controversy. Westinghouse, in preparation for trial of the breach of contract case in the Eastern District of Virginia, has been taking the depositions of the officers of various uranium producing companies, as well as generally engaging in discovery designed to show that the rise in the price of uranium resulted from a world-wide cartel. As a part of its discovery, Westinghouse caused a subpoena to issue in Utah on the resident manager of Rio Algom. The subpoena directed Rio Algom to produce its president, George R. Albino, in Utah for the purpose of taking his deposition and to produce certain business records. George R. Albino now resides, and for several years has been residing, in Canada. There is, however, a dispute between the parties as to whether Albino is presently a citizen of Canada or the United States.

Although Rio Algom has since complied with the subpoena in numerous particulars, it did object to producing certain business documents then located in its offices in Canada, and further objected to producing Albino for depositional purposes, insofar as his testimony might relate to such business records and their contents. The basis for such objection was the belief by Rio Algom that if it produced its business records then located in Canada, and if it produced its president, Albino, and permitted him to be examined concerning such records, then it would be in violation of Canadian law and subject to criminal sanctions. Specifically, Rio Algom claims that if it fully complied with the Westinghouse subpoena it would be in violation of the Canadian Uranium Information Security Regulations, SOR, 76–644 (P.C. 1976–2368, Sept. 21, 1976), promul-

gated under the authority of Canada's Atomic Energy Control Act, R.S.C.1970, c. A–19.

Upon hearing the district court overruled a motion to quash and on May 2, 1977, ordered Rio Algom to produce its business records then on file in Canada and to produce its president, Albino, to be examined concerning the contents of such records.*

Rio Algom did not comply with the May 2 order. Rio Algom was next ordered to show cause why it should not be held in contempt for failing to comply with the May 2 order. Hearing on the show cause order was held on June 21 and July 29, and on the latter date, Rio Algom was adjudged in contempt. It is from the written order of contempt entered on July 29, 1977, that Rio Algom now appeals.

The record reveals that Westinghouse has previously caused letters rogatory to issue to the Supreme Court of Ontario, which letters sought the aid of the Canadian courts in obtaining Rio Algom's business records located in Canada and in taking the deposition of Albino. However, the Ontario Supreme Court declined to enforce the letters rogatory, and dismissed the same on the ground, among others, that to enforce the letters rogatory would cause a violation of the Uranium Information Security Regulations, which constitute a Canadian public policy statement. The regulations were held to fall within the purposes of the Atomic Energy Control Act and to further the national interest, as expressed in the Act, "to control and supervise the development, application and use of atomic energy." The Ontario court further reasoned that the letters rogatory sought to measure conduct of the Canadian Government against laws of the United States so that to enforce the letters would tend to impinge on Canada's sovereignty. The lengthy opinion of the Ontario Supreme Court is *In*

re *Evidence Act,* R.S.O.1970, c. 151 (and *In re: Westinghouse Electric Corp. Uranium Contract Litigation*), —— Ont.2d —— (1977).

On June 23, 1977, Rio Algom formally requested the consent of the Canadian Minister of Energy, Mines & Resources to release the company's records located in Canada to the end that it could fully comply with the discovery order. Such request was formally denied on July 19, 1977, on the ground that "the production of such documents would be contrary to the policy of the Government of Canada in this matter." Rio Algom's letter requesting exemption from the Canadian nondisclosure regulation appears in an Appendix.

Much of the material summarized above is gleaned from the memoranda of counsel, and attachments thereto, filed with the district court in connection with Rio Algom's motion to quash and Westinghouse's request for enforcement of the subpoena. The hearing held in connection with the show cause order on July 29, 1977, consisted mainly of extended colloquy between court and counsel. No witnesses were examined. Rio Algom did offer three exhibits, which were received without objection. Westinghouse offered some thirty-eight exhibits, four of which were received without objection. The district court reserved ruling on the remaining thirty-four exhibits offered by Westinghouse, commenting that the remaining thirty-four exhibits were not necessary and that to admit such might well be "inviting error." It is evident, then, that the district court did not consider thirty-four of the thirty-eight exhibits offered by Westinghouse at the July 29 hearing. Accordingly, in our disposition of the matter we, like the district court, will not, and do not, consider the thirty-four exhibits offered by Westinghouse but not admitted by the district court. Westinghouse, inciden-

* Rio Algom filed a notice of appeal from the trial court's order of May 2, 1977, and in connection therewith sought a stay pending disposition of that appeal. By minute order, this Court denied stay pending appeal on the authority of *Arthur Andersen & Co. v. Finesilver,* 546 F.2d 338 (10th Cir. 1976), *cert. denied,* 429 U.S.

1096, 97 S.Ct. 1113, 51 L.Ed.2d 543 (1977). Implicit in our order was our belief that such appeal was premature. In such circumstance the trial court did not lose jurisdiction of the case and had jurisdiction to hear the contempt matter.

tally, has not in this appeal in any wise challenged the trial court's failure to admit in evidence these thirty-four exhibits.

Rio Algom concedes that it has not fully complied with the discovery order of May 2. The excuse offered for failing to fully comply with the May 2 order is that should it fully comply, then it would be in violation of Canadian law and subject to severe sanctions in that country. The applicable Canadian statute provides for a "normal" penalty for a violation of the regulation of a $5,000 fine, or two years imprisonment, or both. However, should an indictment be returned, and a conviction suffered, then the penalty could be a $10,000 fine, or five years imprisonment, or both. The district court concluded, in effect, that such was not an adequate excuse for the admitted noncompliance, within Fed.R.Civ.P. 45(f). The district court further found that neither Rio Algom nor Albino had diligently sought to comply with its order, nor had either made a good faith showing of inability to comply. Nor had they sought a "timely" exemption from the Canadian nondisclosure law.

In our view the record does not support the finding that Rio Algom has failed to act in good faith, nor does it support the trial court's conclusion that Rio Algom had no adequate excuse for its failure to comply with the discovery order. All things considered, on the basis of the record before it, the district court in our view abused its discretion in adjudging Rio Algom to be in contempt of court, and in imposing the severe sanction in connection therewith. In thus concluding we rely heavily on *Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers,* 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958), and the rationale thereof. Certainly *Societe* is the starting point in our analysis of the matter.

In *Societe* the plaintiff in a pending action in federal court failed to fully comply with a discovery order and as excuse therefor stated that to fully comply with the discovery order would constitute a violation of Swiss law and subject it to sanctions in Switzerland. The district court in *Societe*

found that the plaintiff had acted in good faith, that there was nothing to indicate collusion between the plaintiff and the Swiss authorities, and that Swiss law did indeed preclude production of the documents which the defendant in that proceeding sought to examine. The district court concluded, however, that such did not constitute an adequate excuse for plaintiff's failure to comply with the court's discovery order, and accordingly, under Fed.R.Civ.P. 37, dismissed plaintiff's complaint as a sanction for plaintiff's disobedience. On appeal the Second Circuit Court of Appeals affirmed. On certiorari the Supreme Court reversed and held that "on the record" dismissal was not justified as a sanction for the plaintiff's failure to produce the business records sought to be examined by the defendant. In ordering reinstatement of the action, the Supreme Court spoke as follows:

The findings below, and what has been shown as to petitioner's extensive efforts at compliance, compel the conclusion on this record that petitioner's failure to satisfy fully the requirements of this production order was due to inability fostered neither by its own conduct nor by circumstances within its control. It is hardly debatable that fear of criminal prosecution constitutes a weighty excuse for nonproduction, and this excuse is not weakened because the laws preventing compliance are those of a foreign sovereign. Of course this situation should be distinguished from one where a party claims that compliance with a court's order will reveal facts which may provide the basis for criminal prosecution of that party under the penal laws of a foreign sovereign thereby shown to have been violated. Cf. *United States v. Murdock,* 284 U.S. 141, 149, [52 S.Ct. 63, 76 L.Ed. 210]. Here the findings below establish that the very fact of compliance by disclosure of banking records will itself constitute the initial violation of Swiss laws. In our view, petitioner stands in the position of an American plaintiff subject to criminal sanctions in Switzerland because production of documents in Switzerland

pursuant to the order of a United States court might violate Swiss laws. Petitioner has sought no privileges because of its foreign citizenship which are not accorded domestic litigants in United States courts. Cf. *Guaranty Trust Co. v. United States,* 304 U.S. 126, 133–135, [58 S.Ct. 785, 82 L.Ed. 1224]. It does not claim that Swiss laws protecting banking records should here be enforced. It explicitly recognizes that it is subject to procedural rules of United States courts in this litigation and has made full efforts to follow these rules. It asserts no immunity from them. It asserts only its *inability* to comply because of foreign law.

■ In our view *Societe* holds that, though a local court has the power to order a party to produce foreign documents despite the fact that such production may subject the party to criminal sanctions in the foreign country, still the fact of foreign illegality may prevent the imposition of sanctions for subsequent disobedience to the discovery order. We also believe it to be implicit in *Societe* that foreign illegality does not necessarily prevent a local court from imposing sanctions when, due to the threat of prosecution in a foreign country, a party fails to comply with a valid discovery order. In other words, *Societe* calls for a "balancing approach" on a case-by-case basis. As this Court recently said in *Arthur Andersen & Co. v. Finesilver,* 546 F.2d 338, 341 (10th Cir. 1976), *cert. denied,* 429 U.S. 1096, 97 S.Ct. 1113, 51 L.Ed.2d 543 (1977), "The dilemma is the accommodation of the principles of the law of the forum with the concepts of due process and international comity." For a general background discussion of this problem, see Note, Discovery of Documents Located Abroad in U.S. Antitrust Litigation: Recent Developments in the Law Concerning the Foreign Illegality Excuse for Non-Production, 14 Va.J.Int.L. 747 (1974).

■ Guidance as to the factors to be considered in the balancing of interests is found in the Restatement of the Law. Section 39 of the Restatement (Second) of the Foreign Relation Law of the United States (1965) reads as follows:

§ 39. Inconsistent Requirements Do Not Affect Jurisdiction

(1) A state having jurisdiction to prescribe or to enforce a rule of law is not precluded from exercising its jurisdiction solely because such exercise requires a person to engage in conduct subjecting him to liability under the law of another state having jurisdiction with respect to that conduct.

(2) Factors to be considered in minimizing conflicts arising from the application of the rule stated in Subsection (1) with respect to enforcement jurisdiction are stated in § 40.

Section 40 of the Restatement provides as follows:

§ 40. Limitations on Exercise of Enforcement Jurisdiction

Where two states have jurisdiction to prescribe and enforce rules of law and the rules they may prescribe require inconsistent conduct upon the part of a person, each state is required by international law to consider, in good faith, moderating the exercise of its enforcement jurisdiction, in the light of such factors as

(a) vital national interests of each of the states,

(b) the extent and the nature of the hardship that inconsistent enforcement actions would impose upon the person,

(c) the extent to which the required conduct is to take place in the territory of the other state,

(d) the nationality of the person, and

(e) the extent to which enforcement by action of either state can reasonably be expected to achieve compliance with the rule prescribed by that state.

[3] As indicated, the Supreme Court in *Societe* held that "on this record dismissal of the complaint with prejudice was not justified." Applying to the instant controversy the various factors mentioned in *Societe* and later in the Restatement, we conclude that "on the record" the order holding Rio Algom in contempt and imposing a penalty of $10,000 per day for each day that

Rio Algom failed to comply with the court's discovery order and authorizing the Marshal to physically take over Rio Algom's Utah properties in the event that Rio Algom failed to pay such penalty was "not justified."

In *Societe* the Supreme Court considered primarily the dilemma of the party subject to contradictory laws. As previously noted, the Court considered the fact that the plaintiff in *Societe* had made a good faith and diligent effort to comply with the local discovery order, and had tried to secure a waiver from the foreign government. In the instant case the district court signed an order prepared by Westinghouse which found that Rio Algom had not acted in good faith. Our review of the evidentiary matter before the district court fails to disclose anything which would support such a finding, and such finding is clearly erroneous. The record indicates that Rio Algom has made diligent effort to produce materials not subject to the Canadian regulation. Further, Rio Algom has sought a waiver from the Canadian authorities.

In its order the district court noted that Rio Algom had not requested the exemption or waiver from the Canadian regulation until after the first hearing on the show cause order. Such fact apparently formed the basis, at least in part, for the district court's conclusion that Rio Algom had not acted in good faith. We do not think the timing of Rio Algom's request for an exemption warrants a conclusion of lack of good faith. The fact remains that before the contempt hearing held on July 29 Rio Algom did send a lengthy formal request to the Canadian authorities asking that it be exempt from the regulation in question and that it be permitted to produce its business records then located in Canada for examination by Westinghouse. The letter speaks for itself and is certainly no basis for a finding of lack of good faith. On the contrary, a reading of the request would indicate that such was made in the best of faith. As indicated, the Canadian authorities considered such request and denied it on the grounds that to grant the request would be against the best interests of Canada.

There is nothing in the record which would indicate that Rio Algom or its president "ran" to Canada as this controversy was developing in order to gain the protection of Canadian law. Albino, the president, was a resident of Canada, if not indeed a citizen of Canada, prior to the present controversy. Rio Algom Corporation, the present appellant, is a wholly owned subsidiary of Rio Algom, Ltd., the latter in turn being a Canadian subsidiary of Rio Tinte Zink Corporation, Ltd., which is the head of a worldwide mining conglomerate with headquarters in London, England.

There is the suggestion by Westinghouse, as another aspect of the good faith issue, that Rio Algom in some manner caused the nondisclosure regulation to be promulgated in Canada in order to cover up its activities or that Rio Algom and the Canadian Government acted in collusion. The present record would not support such a finding.

We proceed now to a consideration of other relevant factors, namely the interests of Canada and the United States which place Rio Algom under contradictory demands. The records which Westinghouse seeks to examine are physically located in Canada. Such being the case, it would not seem unreasonable that the Canadian Government should have something to say about how those records will be made available to interested outsiders. That Canada has a legitimate "national interest" in this matter is perhaps best illustrated by reading the opinion of the Ontario Supreme Court, wherein it declined to enforce the letters rogatory which Westinghouse caused to be issued. The Ontario Supreme Court determined that the nondisclosure regulations were in furtherance of a national interest in controlling and supervising atomic energy. The reader of this opinion is directed to the opinion of the Ontario Supreme Court which more fully sets forth the position of the Canadian Government.

The United States admittedly has a "national interest" of its own. In the instant case the United States has an interest in making certain that any litigant in its courts is afforded adequate discovery to the end that he may fully present his claim, or defense, as the case may be. Such is an understandable and legitimate interest. In this regard, however, we do note that Westinghouse's defense in the Virginia litigation does not stand or fall on the present discovery order. Westinghouse has deposed the officers of various other uranium companies, and the present discovery, though admittedly of potential significance, is still in a sense cumulative. We are not here concerned with any grand jury investigation, or the enforcement, as such, of antitrust laws.

█ A "balancing" of all of these various factors leads us to conclude that the trial court's order of contempt and the sanctions imposed in connection therewith are, on the basis of the present record, not justified.

We do not regard our disposition of the present controversy to be in anywise at odds with *Arthur Andersen & Co. v. Finesilver,* 546 F.2d 338 (10th Cir. 1976), *cert. denied,* 429 U.S. 1096, 97 S.Ct. 1113, 51 L.Ed.2d 543 (1977). It is true that in that case we held that the district court had not abused its discretion in entering a discovery order which required Arthur Andersen to produce certain documents, notwithstanding the fact that by the act of producing such records, Arthur Andersen would violate Swiss law. However, in *Arthur Andersen,* we recognized the distinction made in *Societe* between the power to order discovery and the imposition of sanctions for noncompliance. In *Andersen* we left open the question of the effect of foreign law when the district court is considering the sanctions to be imposed for disobedience to the court's discovery order.

█ We recognize that Rio Algom is a Delaware corporation doing business in Utah and hence enjoys the benefits and privileges afforded by the United States. The argument that because of such, Rio Algom is somehow ungrateful when it fails to obey the discovery orders of the local courts and that it is only proper that it be compelled to comply therewith is perhaps superficially appealing. However, this is but one side of the argument. The fact still remains that although Rio Algom is a domestic corporation doing business in Utah, the business records which Westinghouse seeks to examine are physically located in Canada. Canada has a legitimate interest in the disclosure of these documents and the district court erred in failing to consider such interest. There is nothing to indicate that the district court conducted any balancing of interests. On the contrary, the district court's reasoning was that the law of the forum would prevail, regardless of the particular facts of the case. Such approach is not in accord with *Societe.*

Judgment reversed and the district court's order holding Rio Algom in contempt and imposing sanctions in connection therewith is hereby vacated.

## APPENDIX

Toronto

June 23, 1977

The Honourable Alastair Gillespie,
Minister of the Department of
  Energy, Mines and Resources,
580 Booth Street,
Ottawa, Ontario K1A OE4.

Dear Sir:

Rio Algom Corporation, a Delaware corporation, which owns and operates a uranium mine in the State of Utah, U.S.A., has been served with two subpoenas by Westinghouse Electric Corporation. Service was effected at the mine office in Utah. Both subpoenas require the appearance of certain named individuals, Mervyn Lawton and George R. Albino or Alan Lowell to testify on behalf of Westinghouse at the taking of a deposition, and the production of documents in accordance with an attached "Schedule A". The instructions and definitions contained in the schedule extend the scope of the subpoena so as to require the production of documents by companies other than Rio Algom Corporation.

APPENDIX—Continued

A motion to quash the subpoenas was brought by Rio Algom Corporation in the Federal Court in Salt Lake City. The motion was denied and an order of the court was issued requiring compliance with the subpoenas within a thirty day period. During that period Mr. Mervyn Lawton, the mine manager at the Rio Algom Corporation Mine, who was named in one of the subpoenas, submitted to an oral examination as required by the subpoena. In addition, all of the documents which would respond to the subpoena and which were located in the U.S.A. have been produced. The company has a limited number of files in Canada and a search of these has revealed documents relating to matters subsequent to the 31st of December, 1975, and such documents, insofar as they respond to the subpoena, have been produced. With respect to any further documents, Rio Algom Corporation has received the legal opinion of Hasken & Calvin, a Toronto firm of Barristers and Solicitors, which states in part as follows:

"We are advised that the documents which are sought pursuant to the aforesaid deposition subpoena, insofar as they exist and have not already been produced, are located in Canada and, in our opinion, clearly fall within the provision of Section 2 of the Uranium Information Security Regulations."

The opinion goes on to describe the penalty provisions which would apply if documents which fall within the Regulations are improperly produced.

Rio Algom Corporation, as a result, finds itself in a dilemma. It has no desire to offend the court in Utah, but if it complies with the court order in respect to any documents which are subject to the Uranium Information Security Regulations, then it would be in breach, and would cause individuals in Canada to be in breach of the Regulations. This dilemma could be resolved if the Honourable Minister of Energy, Mines and Resources were to consent to the release of the subject documents and to the disclosure of the contents of those documents.

Rio Algom Corporation, therefore, respectfully requests the consent of the Honourable Minister of Energy, Mines and Resources to the release of all documents located in Canada which would respond to the subpoenas and to the disclosure or communication of the contents thereof by Mr. George R. Albino or any other officer, director or employee of Rio Algom Corporation. To assist you in consideration of this request a copy of each of the two subpoenas, together with the attached Notice to Take Deposition and Schedule A, referred to in the first paragraph of this letter are enclosed herewith.

May we hear from you when a decision has been reached in this matter.

Yours respectfully,

J. G. Littlejohn.

JGL/ms

Encl.

c.c. Mr. G. M. MacNabb,
    Deputy Minister.

WILLIAM E. DOYLE, Circuit Judge, dissenting:

I respectfully dissent.

Judge McWilliams' opinion states the facts accurately, but some additional facts need to be set forth, and there is some necessity for a different emphasis.

This suit is by several utility companies and is pending in the United States District Court for the Eastern District of Virginia. The plaintiffs allege a breach of contract to deliver uranium at the price agreed upon. Westinghouse defends on the ground that the contract has become "commercially impracticable" within the meaning of the Uniform Commercial Code due to an unforeseen and substantial increase in the price. This price rise is said to be the result of an international price fixing conspiracy among the uranium producers. In a separate suit Westinghouse seeks damages under the antitrust laws from Rio Algom and others. However, in the breach of contract action Rio Algom is a witness only.

Rio Algom Corporation is the operator of a uranium mine in Utah and there is no indication that it does business in any other place. It is incorporated under the laws of Delaware. It is a wholly owned subsidiary of Rio Algom Limited, a Canadian corporation having its principal place of business in Toronto. These two corporations have common officers, directors and marketing vice-presidents. Rio Algom Corporation has all of its offices, directors, officers and records, including those sought in the instant proceeding, in Toronto.[1]

The present controversy arises as the result of Westinghouse's effort to take the deposition of Albino, the president of both the Rio Algom Corporations, and to obtain the production of documents pertaining to the alleged price fixing conspiracy. On May 3, 1977, the district court, Judge Ritter, ordered the deposition to be taken and also ordered that the documents be produced.

Rio Algom and Albino refused to comply with the order on the ground that compliance would be in violation of the Canadian Uranium Information Security Regulations, SOR, 76–644 (P.C. 1976–2368, Sept. 21, 1976). These regulations were promulgated pursuant to Canada's Atomic Energy Control Act, Can.Rev.Stat. c.A–19 (1970). They expressly prohibit the release or disclosure of "any note, document or other written or printed material in any way related to conversations, discussions or meetings that took place between January 1, 1972 and December 31, 1975 . . . in respect of the production, import, export, transportation, refining, possession, ownership, use or sale of uranium or its derivatives or compounds." The regulations can be waived by the Minister of Energy, Mines and Resources. Rio Algom sought a waiver, but this request was denied. The way the matter stands now is that Rio Algom has complied except in the areas in which the Canadian statutes and regulations prohibit compliance.

The lower court found both Rio Algom and Albino in civil contempt and imposed a fine of $10,000 per day on the corporation, commencing August 1, 1977, and continuing until the respondents complied with its discovery order. It also issued an order of execution by sale of the corporation's Utah property.

There is reason to infer that the Canadian regulations were promulgated in order to counteract the present discovery efforts. The form of the regulations suggests this in that they specifically deal with prohibiting disclosure of evidence which could possibly shed light on the basic controversy. The Ontario decision in In re The Evidence Act, No. GD 75–23978 (Sup.Ct. of Ontario, June 29, 1977), in which the Ontario court denied the issuance of letters rogatory which had been sought by Westinghouse and which had been issued by the United States District Court for the Eastern District of Virginia and the Court of Common Pleas for Allegheny County, Pennsylvania Civil Division, also lends credence to the conclusion that the regulations were adopted for the purpose of preventing discovery in the present litigation. In the Ontario case the opinion quotes extensively from a press release issued by the Minister of Energy, Mines and Resources. This press release expresses the policy of the Canadian government to support "the uranium industry and its dependent mining communities which were suffering from an oversupply and low price situation." The press release also states that the Canadian government initiated discussions resulting in "an informal marketing arrangement among non-United States producers of uranium."[2] According to further statements quoted in the Ontario opinion from the press release, the Canadian government in 1969 adopted a policy of examining all contracts covering the export of uranium "to ensure that the terms and conditions of such contracts

---

1. Rio Algom Limited, the parent corporation here, is related to Rio Tinto Zinc Corporation Limited, a British corporation which has its principal place of business in London. The Zinc Corporation owns the majority of its stock.

2. Id. at 13.

would be in the national interest." [3] In furtherance of this policy, the regulations in issue were adopted in 1976 "in the light of the sweeping demand for such information by U.S. subpoenas." [4]

A further argument for the proposition that the regulations were adopted with the present documents in mind arises from the contemporaneousness of the enactment of the regulations with the empanelling of a grand jury in the United States to investigate possible antitrust violations by uranium producers.

An additional noteworthy fact is the effort to extend the policies that are discussed above to protection of an American corporation which does all of its substantive business in the United States.

The guiding light on this entire subject is the decision of the Supreme Court of the United States in *Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers,* 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958). This was a suit against the United States Attorney General seeking to recover property which had been seized under the Trading with the Enemy Act. There the district court had held that good faith is not a justification for avoiding discovery. The Court of Appeals for the Second Circuit affirmed this holding and the Supreme Court reversed on the ground that the sanction which was there imposed, that of dismissal of the action, was excessive. However, the Supreme Court did not hold that good faith justified avoiding the discovery order. Its discussion shows just the opposite. This is shown by the following quote:

> Whatever its reasons, petitioner did not comply with the production order. Such reasons, and the willfulness or good faith of petitioner, can hardly affect the fact of noncompliance and are relevant only to the path which the District Court might follow in dealing with petitioner's failure to comply.

*Id.* at 208, 78 S.Ct. at 1094. In view of the Supreme Court's discussion of the role or lack of role of good faith and its conclusion as to its effect, this aspect of the majority opinion here cannot be regarded as correct.

In *Societe* the Supreme Court recognized that it would have been relevant had the petitioner there "deliberately courted legal impediments to production of the . . . records." [5]

As we have shown above, there are reasons for concluding that the Rio Algom Corporations here have not taken unkindly to the legal impediments erected to prevent discovery.

The question of good faith came into play in *Societe,* but it was only in connection with the imposition of a sanction. The Supreme Court considered dismissal of the case for noncompliance to be excessive, notwithstanding that it is an authorized sanction under the Rules of Civil Procedure 37(b)(2)(C). As to this the Court said: "[i]t is hardly debatable that fear of criminal prosecution constitutes a weighty excuse for nonproduction, and this excuse is not weakened because the laws preventing compliance are those of a foreign sovereign." 357 U.S. at 211, 78 S.Ct. at 1095.

We recently had the identical problem and followed the same line as that laid down in *Societe.* Our case was *Arthur Andersen & Co. v. Finesilver,* 546 F.2d 338 (10th Cir. 1976), *cert. denied,* 429 U.S. 1096, 97 S.Ct. 1113, 51 L.Ed.2d 543 (1977). There Andersen and Company was accused of fraudulent misrepresentations in violation of securities laws. Ohio, the litigant in the case, demanded that Andersen produce documents in its possession in Geneva, Switzerland. Production was prohibited by Swiss secrecy laws. We held, in line with *Societe,* that discovery could be ordered.

> *Societe* implies that consideration of foreign law problems in a discovery context is required in dealing with sanctions to be imposed for disobedience and not in deciding whether the discovery order should issue.

**3.** *Id.* at 17.

**4.** *Id.* at 18.

**5.** *Id.* at 208–09, 78 S.Ct. at 1094.

546 F.2d at 341. It can be said, therefore, that good faith is not an appropriate standard in deciding whether the documents are to be produced or the deposition is to be given.

The Supreme Court in *Societe* does discuss the flexibility of the discovery rules and therefore a balancing process may well have been contemplated. The Restatement (Second) of the Foreign Relation Law of the United States § 40, which is quoted in the majority opinion, lists factors to be considered in such a process. One such factor applicable in the present case is the great importance in American litigation of the discovery rules. The form of these rules is such that if material is relevant it must be produced. About the only exceptions are that certain privileges provide an excuse. When the strong underlying policy reasons in connection with the discovery rules are pitted against the Canadian policy of protecting its local industries from insufficient prices, no real contest exists. In any event, this was not the reason that emerges from the opinion of the Ontario Supreme Court. Instead the concern was the existence of low prices together with an oversupply. The *Societe* case does not give any weight to the fact that the records and offices are in another country or are mingled with those of the parent corporation in another country. Rio Algom cannot then escape on this basis. It is peculiarly susceptible to the process of the courts of the United States and the laws of the United States. If a balancing test is to be used and relief is to be granted, the case would have to show more merit than we see here.

In view of the foregoing, I take the position that the district court's order requiring Rio Algom to comply is entirely proper and valid. Inasmuch as this is a dissenting opinion, I do not have to decide the issue whether the sanction is excessive. I do, however, believe that the sanction could justifiably be reexamined and possibly modified. I do not believe, however, that the magnitude of the sanction imposed should affect this court's decision on the merits of the question.