In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 08-4030 & 08-4248

HOOSIER ENERGY RURAL ELECTRIC COOPERATIVE, INC.,
*Plaintiff-Appellee*,

*v.*

JOHN HANCOCK LIFE INSURANCE COMPANY; OP MEROM
GENERATION I, LLC; and MEROM GENERATION I, LLC,
*Defendants-Appellants*.

AMBAC ASSURANCE CORPORATION; COBANK, ACB; AE
GLOBAL INVESTMENTS, LLC; and AMBAC CREDIT
PRODUCTS, LLC,

*Defendants-Appellees*.

Appeals from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:08-cv-1560-DFH-DML — **David F. Hamilton**, *Chief Judge*.

ARGUED JANUARY 5, 2009 — DECIDED SEPTEMBER 17, 2009[†]

Before EASTERBROOK, *Chief Judge*, and KANNE and
WOOD, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. Hoosier Energy, a co-op, had
depreciation deductions that it could not use. John Hancock
Life Insurance Co. had income exceeding its available deduc-

---

[†] This opinion is being released in typescript, and the mandate will issue
today, so that the district court may hold a prompt hearing to reexamine the
size of the injunction bond. A printed copy will follow.

tions. The two engaged in a transaction designed to move Hoosier Energy's deductions to John Hancock. They entered into a leveraged lease: John Hancock paid Hoosier Energy $300 million for a 63-year lease of an undivided 2/3 interest in Hoosier Energy's Merom generation plant. Hoosier Energy agreed to lease the plant back from John Hancock for 30 years, making periodic payments with a present value of $279 million. The $21 million difference, Hoosier Energy's profit, represents some of the value to John Hancock of the deductions that John Hancock could take as the long-term lessee of the power plant.

The transaction exposed John Hancock to several risks. The power station might become uneconomic before the parties' estimate of its remaining useful life (roughly 30 years). Or Hoosier Energy might encounter financial difficulties in its business as a whole. As a debtor in bankruptcy, Hoosier Energy would be entitled to repudiate the lease, leaving John Hancock with a power station that it had no interest in operating. Hoosier Energy's obligation as a repudiating debtor would be considerably less than the present value of the rentals. See 11 U.S.C. §502(b)(6). So Hoosier Energy agreed to provide John Hancock with additional security, in the form of both a credit-default swap and a surety bond. Ambac Assurance Corporation and three affiliates agreed to pay John Hancock approximately $120 million if certain events occurred. (For its part, Hoosier Energy posted substantial liquid assets to Ambac's credit, in order to protect Ambac should it be required to pay John Hancock; this was part of the transaction's swap feature.) A credit-default swap, like a letter of credit, is a means to assure payment when contingencies come to pass, without proof of loss (as a surety bond would require). One of the contingencies in this transaction is a reduction in Ambac's own credit rating. If that rating falls below a prescribed threshold, Hoosier Energy has 60 days to find a replacement that satisfies the contractual standards.

During 2008 Ambac's credit rating slipped below the threshold. John Hancock then demanded that Hoosier Energy find a replacement, and it extended the deadline from 60 days to more than 120 days when Hoosier Energy reported trouble. Whether replacing Ambac was "impossible" at the time, as Hoosier Energy maintains, or just would have cost Hoosier Energy more than it was willing to pay, as John Hancock believes, is a subject that remains in dispute. When the extended deadline arrived, Hoosier Energy told John Hancock that it was in

negotiations with Berkshire Hathaway to replace Ambac. John Hancock concluded that "in negotiations" was not good enough (perhaps it suspected Hoosier Energy of stalling) and called on Ambac to perform. Ambac is ready, willing, and able to meet its obligations. But before Ambac could pay, Hoosier Energy filed this suit under the diversity jurisdiction, and the district court issued a temporary restraining order. The justification for that order, since replaced by a preliminary injunction, is that if Ambac pays, it will demand that Hoosier Energy cover the outlay, and that this will drive Hoosier Energy into bankruptcy—a step that the district court called an irreparable injury.

Irreparable injury is not enough to support equitable relief. There also must be a plausible claim on the merits, and the injunction must do more good than harm (which is to say that the "balance of equities" favors the plaintiff). See *Winter v. Natural Resources Defense Council, Inc.*, 129 S. Ct. 365 (2008); *Illinois Bell Telephone Co. v. WorldCom Technologies, Inc.*, 157 F.3d 500 (7th Cir. 1998). How strong a claim on the merits is enough depends on the balance of harms: the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief. See *Cavel International, Inc. v. Madigan*, 500 F.3d 544 (7th Cir. 2007); *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of America, Inc.*, 549 F.3d 1079 (7th Cir. 2008). The district court concluded that an injunction would have net benefits, because John Hancock would remain well secured in its absence (it remains the lessee of a power station that is essential to Hoosier Energy's business, so Hoosier Energy will not abandon the lease), and that Hoosier Energy's position on the merits is strong enough to support relief while litigation continues. 588 F. Supp. 2d 919 (S.D. Ind. 2008). The district court also directed Hoosier Energy to post $2 million in cash, a $20 million injunction bond with sureties, and an unsecured bond of $130 million, to ensure that John Hancock would be made whole should it prevail in the litigation.

As for the merits: The district court thought that Hoosier Energy has two arguments with enough punch to justify interlocutory relief. The first is that the transaction is an abusive tax shelter. The district court observed that the Internal Revenue Service has declined to allow similar transactions to transfer deductions from one corporation to another and concluded that this transaction probably should be unwound. The second

is that, under New York law (which the parties agree supplies the rule of decision), "temporary commercial impracticability" permits Hoosier Energy to defer coming up with another swap partner until the economy has improved.

John Hancock disputes both of these conclusions, but its appellate brief opens with the contention that Hoosier Energy lacks standing to complain. After all, John Hancock observes, Ambac is willing and able to perform. What interest does Hoosier Energy have in whether Ambac performs under a contract that, the parties agreed, would be deemed independent of Hoosier Energy's promises? The answer is that, if Ambac pays John Hancock, then Hoosier Energy must pay Ambac. (The funds already on deposit with Ambac are insufficient to cover all of Hoosier Energy's obligations.) A payout would be injury, caused by John Hancock's acts, and remediable by a favorable judicial decision. That's enough for standing under the Supreme Court's precedents. See, e.g., *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 102–05 (1998).

This is a three-corner transaction (four-corner, if one counts the IRS). It was accomplished through a series of nominally independent contracts spanning more than 3,000 pages. But it would press legal fiction beyond the breaking point to say that the independent enforceability of each party's promises to the others meant that any of the three parties lacked standing to complain about acts of the others that will produce an immediate, concrete injury. It may be that Hoosier Energy has waived its right to complain (that, too, is a subject on which litigation lies ahead), but a waiver is a defense on the merits, which differs from the absence of an Article III case or controversy.

On the subject of irreparable injury, appellate review is deferential at the preliminary injunction stage, and we lack an adequate basis on which to disagree with the district court's assessment. That leaves the question whether Hoosier Energy has a plausible theory on the merits—not necessarily a winning one, but a claim strong enough to justify exposing John Hancock to financial risks until the district court can decide the merits. We do not agree with all of the district judge's reasoning, but we do not think that the court erred in thinking Hoosier Energy's claim sufficient for this limited purpose, given Ambac's continuing ability to perform and the injunction bonds posted under Fed. R. Civ. P. 65(c).

Let us start with the question whether the transaction is an illegal tax shelter that must be unwound rather than enforced. The district court's approach has two steps: First, the court concluded that the transaction lacks economic substance and therefore cannot be employed to transfer tax benefits from Hoosier Energy to John Hancock. Second, the court believed that a tax shelter that the Internal Revenue Code does not allow is "illegal" as a matter of contract law. The first of these steps may or may not be right; the tax treatment of leveraged leases, and related transactions such as the sale and leaseback, can be difficult. See, e.g., *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978). The second is wrong. A leveraged lease is a perfectly enforceable contract. Whether or not the contract lawfully transfers tax benefits, there is nothing wrong with, or illegal about, the contract itself; only the claim of tax benefits *from* the contract would be problematic.

All questions about tax benefits to one side, a leveraged lease is simply a loan secured by a lease rather than a mortgage. John Hancock needs to make investments in order to have money available to pay the death benefits on its life insurance policies. Often it invests in real estate. The transaction with Hoosier Energy is one in which John Hancock invested $300 million in exchange for a promised stream of repayments that would last 30 years; it also obtained a security interest in the assets that Hoosier Energy would use to produce the funds for repayment. Neither New York nor Indiana would call such a transaction illegal, and the fact that a credit-default swap improved the lender's security does not create any additional problem.

Hoosier Energy has not cited, and we have not found, any decision holding a leveraged lease or sale-and-leaseback unenforceable as a matter of contract law, just because the main (or even the sole) reason for structuring the transaction that way, rather than as a loan, was tax benefits. "Economic purpose" is not a requirement for the enforceability of contracts. If the Green Bay Packers cut a player one day and then re-sign him the next, a court would not dream of canceling the new contract on the ground that a release-and-resign sequence lacks economic purpose. The Commissioner of Internal Revenue will address the question whether the leveraged-lease transaction provides John Hancock with the tax benefits it seeks. If the answer turns out to be no, Hoosier Energy still owes John Han-

cock the promised rental payments (and is entitled to keep the $21 million premium), while Ambac still provides security for those payments.

New York law is skeptical of contentions that irregular dealings between one contracting party and the government excuse the other contracting party's performance. For example, *John E. Rosasco Creameries, Inc. v. Cohen*, 11 N.E.2d 908, 909 (N.Y. 1937), held that the dairy's customer must pay for goods received, even though the dairy lacked a license and thus should not have been in business. In New York, "[a]s a general rule also, forfeitures by operation of law are disfavored, particularly where a defaulting party seeks to raise illegality as 'a sword for personal gain rather than as a shield for the public good.'" *Lloyd Capital Corp. v. Pat Henchar, Inc.*, 603 N.E.2d 246, 248 (N.Y. 1992), quoting from *Charlebois v. J. M. Weller Associates, Inc.*, 531 N.E.2d 1288, 1292 (N.Y. 1988). These cases illustrate Justice Holmes's quip that there is a strong "policy of preventing people from getting other people's property for nothing when they purport to be buying it." *Continental Wall Paper Co. v. Louis Voight & Sons Co.*, 212 U.S. 227, 271 (1909) (Holmes, J., dissenting). John Hancock's taxes are a matter for it to resolve with the IRS; that John Hancock may have set out to take larger deductions than the law allows does not affect Hoosier Energy's contractual duties.

This leaves the doctrine of "temporary commercial impracticability." John Hancock's principal argument on this front is that New York law does not recognize any such doctrine. Like other states, New York recognizes the doctrine of impossibility—but even then only the kind of impossibility that the parties could not have anticipated. As John Hancock describes things, the parties anticipated the possibility that Hoosier Energy, Ambac, or both might get into financial distress and provided what was to happen: if Hoosier Energy did not come up with better security in 60 days, John Hancock could draw on the credit-default swap to protect itself. When the economy turned sour, and the risk materialized, John Hancock tried to take advantage of this extra security. Yet the district court deemed the risk's coming to pass as a reason why John Hancock could *not* draw on the security. John Hancock sees this as perverse, an order that defeats the parties' bargained-for allocation of risks. The district court may have thought that economy-wide conditions justified this reallocation, but it is hard to

see how an economic downturn can be alleviated by making contracts less reliable. Enforceable contracts are vital to economic productivity. See Simeon Djankov, Oliver Hart, Caralee McLiesh & Andrei Shleifer, *Debt Enforcement around the World*, 116 J. Pol. Econ. 1105 (2008); Thomas Cooley, Ramon Marimon & Vincenzo Quadrini, *Aggregate Consequences of Limited Contract Enforceability*, 112 J. Pol. Econ. 817 (2004).

Whether Hoosier Energy's performance was "impossible" in the strong sense that contract law requires depends on what its obligations were. John Hancock urges on us the perspective that, when Ambac's credit rating slipped, Hoosier Energy had an option: find a new surety in 60 days, or pay Ambac the sums to which Ambac would become entitled once it paid John Hancock. The holder of an option may not be able to take advantage, but that differs from impossibility. Suppose that Hoosier Energy had an in-the-money option to purchase the Indianapolis Colts by the end of December 2008, and that as a result of the reduced availability of credit it was unable to find a lender to finance the transaction. That would not make performance "impossible" and extend the option's expiration, effectively giving Hoosier Energy a new option (for 2009) for free. Likewise if Hoosier Energy had borrowed $100 million and was obliged to pay the money back on October 1, 2008. That Hoosier Energy found itself unable to borrow money to roll over the loan would not excuse repayment; the "impossibility" doctrine never justifies failure to make a payment, because financial distress differs from impossibility. See *Restatement (Second) of Contracts* §261 & comment d.

The uranium case illustrates these propositions. Westinghouse sold uranium on long-term requirements contracts at fixed prices, thus assuming the risk that market prices would rise (and it would lose money). Westinghouse anticipated that market prices would fall; its customers thought they would rise, or at least wanted protection against higher prices. And rise they did, partly as a result of a cartel. Westinghouse had neglected to protect its position in futures markets or through long-term forward contracts. Faced with large losses if it had to buy uranium on the spot market and resell to customers at lower prices, Westinghouse contended that the unanticipated spike in uranium prices made its performance impossible. The argument failed; the court observed that Westinghouse and its customers had negotiated over the risk of higher prices for ura-

nium, and that the occurrence of the risk did not excuse one side's performance. Even if the losses drove Westinghouse into bankruptcy, that would not make performance "impossible"; it would just assure that all of Westinghouse's creditors received equal treatment. See *In re Westinghouse Electric Corp. Uranium Contracts Litigation*, 563 F.2d 992 (10th Cir. 1977); Richard A. Posner & Andrew M. Rosenfield, *Impossibility and Related Doctrines of Contract Law: An Economic Analysis*, 6 J. Legal Studies 83 (1977).

Much the same can be said about Hoosier Energy. If keeping its promise to Ambac drives it into bankruptcy, this ensures equal treatment of its creditors. It is hard to see why Hoosier Energy should be able to stiff John Hancock or Ambac, while paying 100¢ on the dollar to all of its other trading partners, just because the very risk specified in the contracts between Hoosier Energy and John Hancock has occurred. Hoosier Energy did not expect an economic downturn, but Westinghouse did not expect an international uranium cartel. Downturns and cartels are types of things that happen, and against which contracts can be designed. When they do happen, the contractual risk allocation must be enforced rather than set aside. The district court called the credit crunch of 2008 a "once-in-a-century" event. That's an overstatement (the Great Depression occurred within the last 100 years, and the 20th Century also saw financial crunches in 1973 and 1987), and also irrelevant. An insurer that sells hurricane or flood insurance against a "once in a century" catastrophe, or earthquake insurance in a city that rarely experiences tremblors, can't refuse to pay on the ground that, when a natural event devastates a city, its very improbability makes the contract unenforceable.

We postponed discussing New York law until the general points of contract doctrine had been set out. New York law is consistent with what we have said; indeed, New York takes a very dim view of "impossibility" defenses and has never suggested that, when an impossibility defense is unavailable, a "temporary commercial impracticability" defense might serve instead. New York courts refuse to excuse performance where difficulty "is occasioned only by financial difficulty or economic hardship, even to the extent of insolvency or bankruptcy." *407 East 61st Garage, Inc. v. Savoy Fifth Avenue Corp.*, 244 N.E.2d 37, 41 (N.Y. 1968). This applies to financial instruments—and, although impossibility might allow a party to suspend its obliga-

tions under a financial swap contract, this means more than a short-term inability to pay money. *General Electric Co. v. Metals Resources Group Ltd.*, 741 N.Y.S.2d 218 (App. Div. 2002). For its part, Hoosier Energy all but ignores New York law; its brief cites only a single decision, by a trial court; appellate decisions go unmentioned. And the trial-court decision that Hoosier Energy cites speaks of temporary impossibility, not "temporary commercial impracticability."

All of this assumes, however, that John Hancock is right to characterize Hoosier Energy as having an option to find a better surety. As Hoosier Energy understands the contract, however, it had a *duty* to find a better surety, and failure to perform this duty was the default allowing John Hancock to draw on the swap. Then it might be possible to make out a real impossibility defense, meaning that (a) all parties to the transaction assumed, when they negotiated the terms, that it would be possible to find *some* other intermediary with adequate credit standing, and (b) as a result of a financial crisis, no such intermediary existed in late 2008, no matter how much Hoosier Energy offered to post in liquid assets to secure its obligations.

Even this would be a difficult defense to make out under New York law. The leading New York case on impossibility, *Kel Kim Corp. v. Central Markets, Inc.*, 519 N.E.2d 295 (N.Y. 1987), says that the defense works only if some unexpected event upsets all parties' expectations; it is not enough that the unexpected event puts one side in a bind. The lessee of a roller skating rink was required by contract to obtain liability insurance, which it got and maintained six years before the insurer declined to renew. When the policy expired, the lessor asserted default, and the lessee sought a declaration that performance was excused by impossibility, because no insurer would underwrite a liability policy for a roller rink at any price. Rejecting the lessee's argument, the Court of Appeals stated that impossibility can excuse performance only if the new event "could not have been foreseen or guarded against" in the contract. Financial distress could be and was foreseen; that's what the credit-default swap is all about. But if no one could have foreseen the extent of the credit crunch in 2008—and if it *really* made performance impossible, a subject on which the parties profoundly disagree—then the sort of argument that Hoosier Energy makes could satisfy the requirements of *Kel Kim*.

We have said enough to show that there is uncertainty about how this suit comes out under New York law. It is uncertain whether Hoosier Energy had a *duty* to replace Ambac, or just an option; the impossibility defense is unavailable if the option characterization is correct. (We have avoided quoting the documents; some portions of these lengthy contracts support each side's characterization of them.) It is uncertain whether the extent of the 2008 credit crunch, which extended into 2009, was foreseeable. It is uncertain whether Hoosier Energy could have replaced Ambac by offering more, or better, security to another intermediary. Hoosier Energy undermined its own position in the litigation by telling John Hancock that it was negotiating with Berkshire Hathaway and could strike a deal with just a little more time, which implies that replacing Ambac was *not* impossible, but John Hancock returned the favor by suggesting that this deal was just pie in the sky and that Hoosier Energy would not or could not ever replace Ambac—and, if "could not" is the right understanding, perhaps performance was impossible after all.

All of these uncertainties collectively support the district court's conclusion that Hoosier Energy has some prospect of prevailing on the merits. Because appellate review is deferential, the district court's understanding must prevail at the interlocutory stage.

But what was impossible in fall 2008 may well be possible in fall 2009. What is more, the longer this impasse continues, the more the balance of equities tilts in favor of John Hancock. Recall that the reason for the credit-default swap was concern that the Merom station would eventually become non-economic because of changes in the market for electricity, the regulation of emissions from coal-fired stations, or the advancing age of the plant. The more time passes, the more serious this risk—and the greater the risk that one or another problem may afflict Hoosier Energy as a firm. If, as Hoosier Energy asserts, meeting Ambac's demands under the swap contract will drive it into bankruptcy, then Hoosier Energy must be skating close to the edge, and the longer it skates there the greater the cumulative risk that it will fall over. Similarly Ambac may become less desirable as a swap partner; while this appeal has been under advisement, Ambac's credit rating has been reduced twice.

John Hancock is entitled to the security it negotiated against these possible outcomes. The injunction bonds, at only

$22 million in liquid security, do not cover John Hancock's exposure. The change in Ambac's credit rating, in particular, requires the district court to take a new look at the adequacy of the Rule 65(c) security promptly after receiving this court's mandate (which will be issued together with this opinion). So although we affirm the district court's preliminary injunction, we conclude that, if Hoosier Energy has not produced a replacement for Ambac by the end of 2009, the time will have arrived when the court must let John Hancock realize on its security. The district court itself stressed the word "temporary" in "temporary commercial impracticability"; we are confident that the court will not allow "temporary" to drag out in the direction of permanence.

AFFIRMED