**GRACO, INC., Plaintiff,**

v.

**KREMLIN, INCORPORATED, and SKM, a French body corporate, Defendants.**

**No. 81 C 3636.**

United States District Court,
N.D. Illinois, E.D.

April 13, 1984.

Granger Cook, Jr., Andrew C. Holcomb, Cook, Wetzel & Egan, Ltd., Chicago, Ill., Paul L. Sjoquist, Peterson, Palmatier, Sturm, Sjoquist & Baker, Ltd., Minneapolis, Minn., for plaintiff.

James G. Staples, Michael J. Garvey, Baker & McKenzie, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge.

This patent infringement suit is before the court on two motions brought by plaintiff—a motion to compel under Fed.R. Civ.P. 37(a), and a motion for the issuance of a commission under Fed.R.Civ.P. 28(b). For the reasons stated below, the court grants in part and denies in part plaintiff's motion to compel and denies its motion for the issuance of a commission.

Plaintiff is Graco, Inc., a Minnesota corporation. It filed this suit against SKM, a French body corporate, and against Kremlin, Incorporated, an Illinois corporation wholly owned by SKM, alleging infringement of United States Patent No. 3,843,052. Graco served interrogatories and requests to produce, directed at both defendants, shortly after filing its complaint.[1] SKM moved to dismiss for want of personal jurisdiction, and the court stayed discovery against SKM, pending its ruling on SKM's motion. On August 23, 1982 the court denied SKM's motion. *Graco, Inc. v. Kremlin, Inc.*, 558 F.Supp. 188 (N.D.Ill. 1982).

Over the course of the next few months Graco and SKM engaged in informal discussion of Graco's outstanding discovery requests, but by February, 1983 SKM still had not filed any formal response. On February 8, 1983 Graco brought the present motions. Graco moved to compel SKM to respond to its discovery requests and for an award of expenses and attorney fees. Observing that SKM had not even filed objections to its discovery requests, Graco asked that SKM be ordered to respond without objection. Graco also moved for the issuance of a commission to allow the taking of evidence in France. SKM filed written responses to these motions, and Graco filed a reply. On April 4 the court ordered SKM to file formal discovery responses, and on May 17, having obtained an extension of time, SKM filed its responses, which consisted almost entirely of objections. On June 15 the court met with counsel in chambers, to discuss SKM's objections, to air its initial impressions, and to direct further briefing of certain issues. Graco and SKM have filed their additional memoranda, including supplemental memoranda filed in January, 1984.

1. Before January 1, 1984 the rules of this court required that discovery requests be filed with the Clerk of the Court. It does not appear that Graco filed its requests with the Clerk. SKM has not, however, disputed Graco's statement that it served its interrogatories and requests to

## I. GRACO'S MOTION TO COMPEL

SKM's objections are based on the following: an asserted lack of personal jurisdiction; an asserted lack of subject-matter jurisdiction; a French statute relating to the communication of information in connection with foreign judicial proceedings; an international convention relating to the taking of evidence; attorney-client privilege; and various relevance grounds.

### JURISDICTION

██ The court addresses SKM's jurisdictional objections first. As SKM recognizes, the court already has determined that it has jurisdiction over SKM's person. 558 F.Supp. 188. As to subject-matter jurisdiction, SKM states:

> This Court lacks subject matter jurisdiction over the acts of SKM, irrespective of whether personal jurisdiction over SKM exists, because SKM does not conduct, within the meaning of 35 U.S.C. 271, any patent infringing activity within the geographical limits of the patent law (Title 35, U.S.C.).

(SKM response to interrogatories filed 5/17/83, p. 2; SKM response to request to produce filed 5/17/83, p. 2.) The court rejects this challenge to its subject-matter jurisdiction. At least within the context of domestic law, the proper question is not whether the court has subject-matter jurisdiction "over the acts of SKM"; instead the proper question is whether the court has subject-matter jurisdiction over this lawsuit. Graco alleges that both defendants have committed acts infringing its patent within the Northern District of Illinois. (Complaint ¶ 5.) Graco's suit therefore arises under the United States patent laws, and this court has subject-matter jurisdiction under 28 U.S.C. § 1338(a), which confers upon the district courts original juris-

produce on July 29, 1981. (Graco memo re: motion to compel filed 2/3/83, p. 2.) The text of Graco's discovery requests is part of the record, since copies of the requests were submitted in support of Graco's motion to compel.

diction to hear civil actions arising under any Act of Congress relating to patents.[2]

## THE FRENCH BLOCKING STATUTE AND THE HAGUE CONVENTION

SKM relies on French Law No. 80–538 of July 16, 1980, amending Law No. 68–678 of July 26, 1968 ("the French Blocking Statute" or "the Blocking Statute"). SKM also relies on the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, March 18, 1970, 23 U.S.T. 2555; T.I.A.S. No. 744 ("the Hague Convention" or "the Convention"), to which the United States and France are signatories.[3] The Blocking Statute obviously is a manifestation of French displeasure with American pre-trial discovery procedures, which are significantly broader than the procedures accepted in other countries. Foreign displeasure with the scope of American procedures also is relevant to understanding various aspects of the Convention.

▮ The Hague Convention provides two different mechanisms for cooperative international discovery, and the court summarizes them briefly. Chapter I of the Convention allows a court in one state to direct a Letter of Request to a designated authority in a second state, who will execute the Letter by taking evidence in the second state. Compulsion will be employed in execution of the Letter, as appropriate under the laws of the second state. Article 23 of Chapter III permits contracting states to declare that they "will not execute Letters of Request issued for the purpose of obtaining pre-trial discovery of documents as known in Common Law countries."

France has made this declaration, and it therefore is to be expected that discovery under this procedure will be more limited than that authorized by the Federal Rules of Civil Procedure.

Chapter II of the Convention allows a court in one state to obtain discovery in a second state through its own diplomatic or consular personnel who perform their functions in the second state, or through a person whom the court has commissioned to take evidence.[4] Such personnel or commissioners may take evidence, without compulsion, from nationals of the first state; or, with prior permission, they may take evidence, without compulsion, from nationals of the second state or of third states. Article 18 of Chapter II permits contracting states to declare that, upon application, they will assist such personnel or commissioners by employing compulsion to obtain evidence. France has not made this declaration. Further, France has declared that commissioners and diplomatic or consular personnel will be permitted to take evidence from French nationals and nationals of other states only upon certain assurances that appearance is voluntary. In this case SKM has argued that this court's power to order discovery and to impose sanctions on SKM, a party before the court, places SKM under compulsion for purposes of the Convention and France's declarations.

## THE FRENCH BLOCKING STATUTE

The French Blocking Statute contains four provisions, two of which substantively define prohibited conduct.[5] Art. 1 prohibits

---

**2.** Jurisdiction also might be based on diversity of citizenship, 28 U.S.C. § 1332. The complaint alleges that Graco is a Minnesota corporation with its principal place of business in Minnesota, that Kremlin is an Illinois corporation with its principal place of business in Illinois, and that SKM is a French body corporate with its principal place of business in France. The amount in controversy does not appear, however, from the face of the complaint.

**3.** The text of the Convention is reprinted as a note following 28 U.S.C.A. § 1781 (West Supp. 1983).

**4.** There are some differences between appointing a commissioner and proceeding through diplomatic or consular personnel. The Convention therefore may be said to provide three different procedures. *Pain v. United Technologies Corp.,* 637 F.2d 775, 788 n. 67 (D.C.Cir. 1980), *cert. denied,* 454 U.S. 1128, 102 S.Ct. 980, 71 L.Ed.2d 116 (1981).

**5.** Law No. 68–678 of July 26, 1968 enacted limited blocking provisions relating to investigation of the international shipping industry. Law No. 80–538 of July 16, 1980 amended Law No. 68–678 and increased its scope greatly. The court's references are to the provisions of Law No.

French nationals (and certain others with ties to France), anywhere, from communicating to foreign public authorities information relating to economic, commercial, industrial, financial or technical matters, if such communication might be harmful to France. The prohibitions of this section are subject to treaties and international agreements. The court does not understand SKM to be relying on Art. 1, and there certainly has been no showing that the discovery requested by Graco would be harmful to France. *See Wilson v. Stillman & Hoag, Inc.,* 121 Misc.2d 374, 467 N.Y.S.2d 764 (Sup.Ct.1983).

SKM relies on Art. 1-bis, which states:

Subject to treaties or international agreements and laws and regulations in force, it is forbidden to all persons to ask, research or communicate, by writing, orally or under any other form, documents or information on economical, commercial, industrial, financial or technical matters leading to establishing proofs for use directly or indirectly in foreign judicial or administrative proceedings.

(Translation attached as exhibit A to *Soletanche and Rodio, Inc. v. Brown and Lambrecht Earth Movers, Inc.,* 99 F.R.D. 269, 273 (N.D.Ill.1983) (Grady, J.).[6] Unlike Art. 1, Art. 1-bis is not limited to communications harmful to France, its prohibitions are not limited to French nationals, and it does not explicitly provide for extraterritorial application. Like Art. 1, Art. 1-bis is subject to treaties and international agreements. Graco and SKM agree that Art. 1-bis is not violated by discovery that complies with procedures specified in the Hague Convention.

Art. 2 requires that persons requested to make prohibited communications notify the relevant authorities. Art. 3 provides that violations of Art. 1 and Art. 1-bis are punishable by imprisonment of from two to six months, and by a fine of from 10,000 Francs to 120,000 Francs (approximately $1,000 to $15,000).

SKM argues that it should not be ordered to comply with Graco's discovery requests, because to do so could subject it to liability under the Blocking Statute. The landmark case governing the treatment to be given such objections is *Societe Internationale v. Rogers,* 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958). In *Societe* a Swiss holding company sued to recover property which the United States had seized, as property owned by an enemy national, during World War II. The Government sought discovery as to the ultimate ownership of the holding company, and the Swiss government seized the relevant records under its secrecy laws, preventing compliance. Because the plaintiff failed to comply with discovery orders, the District Court dismissed its suit with prejudice. The Supreme Court held, however, that such a drastic sanction was improper on the record before the District Court. The Court made it clear that the conflict with Swiss law did not bar an order compelling production, and the Court also indicated that the plaintiff's good or bad faith in attempting to comply with discovery orders would determine whether the most severe sanctions would be appropriate.[7]

In addition to *Societe,* other important guidelines for the court's analysis are *Restatement (Second) of Foreign Relations Law of the United States* § 40 (1965); *Restatement of Foreign Relations Law of the United States (Revised)* § 420 (Tent. Draft No. 3, 1982); and Judge Prentice H.

---

68–678 as amended by Law No. 80–538, rather than to the provisions of Law No. 80–538 itself.

**6.** Another translation may be found in Toms, *The French Response to the Extraterritorial Application of United States Antitrust Laws,* 15 Int'l.Law. 585, 611 (1981).

**7.** Because the plaintiff in *Societe* was suing to recover confiscated property, the Court pointed out, its suit in effect was a post-deprivation hearing guaranteed by the Due Process and Just Compensation Clauses of the Fifth Amendment. 357 U.S. at 210–11, 78 S.Ct. at 1094–95. Courts generally have not emphasized this aspect of *Societe. But see In re Grand Jury proceedings,* 691 F.2d 1384, 1389 (11th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 3086, 77 L.Ed.2d 1348 (1983).

Marshall's thorough discussion in *In re Uranium Antitrust Litigation*, 480 F.Supp. 1138 (N.D.Ill.1979). Under all these (and almost all other) sources, the court should not view the French Blocking Statute as an absolute bar to ordering the discovery sought by Graco; rather, the court must weigh and balance various factors in determining whether to order discovery and whether, should SKM fail to comply with the court's order, to impose sanctions on SKM.[8]

■ An initial—and important—question is whether there truly is a conflict between Graco's requested discovery and the French Blocking Statute. The court's tentative conclusion, for purposes of this motion, is that there is such a conflict.[9] Art. 1-bis prohibits the communication of economic, commercial, industrial, financial, or technical information in connection with foreign judicial proceedings. This patent litigation involves paint-spraying equipment. Graco seeks discovery relating not only to the development and design of SKM's equipment, but also to SKM's sales of its equipment. The court perceives only two possible ways in which the requested discovery may avoid the prohibitions of Art. 1-bis. First, SKM may be able to comply with Graco's discovery requests outside the territorial reach of Art. 1-bis. Second, it may be possible for SKM to comply with the discovery requests while complying also with the Hague Convention, to which the prohibitions of Art. 1-bis are subject. The court tentatively rejects both of these possibilities.

The territorial reach of Art. 1-bis is not perfectly clear. Art. 1-bis does not contain the word "anywhere," as does Art. 1, and it apparently is not intended to have extraterritorial application. It has been pointed out

that other provisions of French law may operate to give extraterritorial effect to Art. 1-bis, and it has been suggested, in particular, that communication of information outside France could violate Art. 1-bis if any act involved in such communication is performed in France. Toms, *The French Response to the Extraterritorial Application of United States Antitrust Laws*, 15 Int'l Law. 585, 594–95 & n. 36 (1981). Of course, the court will not attempt to decide a question of French law unless and until such a difficult determination becomes necessary. For present purposes it is enough to point out that SKM's compliance with Graco's discovery requests necessarily would involve at least some activity in France, such as gathering documents or information. On that basis, the court tentatively concludes that it would not be possible for SKM to avoid Art. 1-bis completely by effecting its compliance outside France. On the other hand, conflict with France and its Blocking Statute can be minimized by SKM's performing as much of its compliance activity as possible outside France. Thus, depositions can be taken in the United States, and documents and other tangible items can be brought to the United States and here given to Graco.

The court's tentative conclusion is that it also will not be possible to avoid violating Art. 1-bis by utilizing either of the procedures specified in the Hague Convention—transmittal of a Letter of Request or the taking of evidence by a commissioner or by United States diplomatic or consular personnel. The court emphasizes that its conclusions in this regard are only tentative. Additionally, the court notes that although the Hague Convention is a treaty of the United States, the court's present inquiry is not so much an attempt to construe the

---

**8.** Certain opinions of the Court of Appeals for the Second Circuit suggested that foreign non-disclosure laws should be treated as absolutely barring court orders compelling production. Whether or not this actually was the law of the Second Circuit, that Circuit "clearly has moved to a more flexible position." *SEC v. Banca Della Svizzera Italiana*, 92 F.R.D. 111, 115 (S.D. N.Y.1981).

**9.** Even where there is no conflict with a foreign law, courts are well advised to proceed cautiously any time they order discovery involving activity within another country. *See Restatement (Revised)* § 420 (Tentative Draft No. 3, 1982).

Convention as it is an attempt to predict how French authorities would construe it.

As noted above, France has declared that "it will not execute Letters of Request issued for the purpose of obtaining pre-trial discovery of documents as known in Common Law countries." SKM has devoted substantial attention to this point, and has supported its memorandum with opinions of foreign courts and law review articles. SKM's discussion, and the authorities supporting it, indicate that French procedure is much different from American procedure. Evidence apparently is collected by the court, with assistance of counsel. This evidence-gathering is considered part of the trial itself. Conducting such evidence-gathering is the prerogative of the courts and is considered an exercise of the country's "judicial sovereignty."

The court is unable to draw any firm conclusion as to the scope of discovery that can be obtained from France by a Letter of Request. In one place SKM suggests an extremely narrow rule:

> France sought to ensure that discovery taken from its citizens pursuant to international letters of request would only be for the purpose of obtaining evidence that would be relevant, competent and admissible at trial.

(SKM memo re: commission filed 3/14/83, p. 7, footnote omitted.) In another place SKM seems to suggest that somewhat broader discovery is possible through letters of request:

> This reservation is intended to prevent foreign litigants from compelling the production of documents and information that is not competent, material and admissible at trial, but is more in the nature of a fishing expedition. Document requests with the proper focus, as well as written interrogatories and questioning of potential witnesses of a scope reasonably related to the trial of the lawsuit, are permissible under international letters of request and indeed sanctioned by French civil procedure.

(SKM memo re: commission filed 3/14/83, p. 16.) On the record before the court,

there is great uncertainty as to the scope of discovery that Graco may obtain through a Letter of Request to France. SKM's discussion does not even come close to answering all the court's questions. SKM has not, for instance, given the court any indication of exactly what interrogatories, requests to produce, or deposition questions it believes it can answer under a Letter of Request. The court therefore cannot fault Graco for refusing to limit its discovery to this procedure. SKM regrettably has argued that Graco's reluctance demonstrates bad faith, stating:

> Finally, SKM submits that Graco cannot in good conscience argue that discovery in France under an international letter of request is too limited for its purposes. To do so would be a tacit admission that its outstanding discovery requests are subject to attack as being overreaching because the letter of request alternative urged by SKM clearly permits Graco to discover evidence admissible at trial; it merely places a modest restraint on fishing expeditions.

(SKM memo re: commission filed 3/14/83, p. 17.) The present record does not allow the court to agree with SKM's assessment of Graco's position. Tentatively, for purposes of the present ruling, the court assumes that a Letter of Request would not be adequate to allow Graco the discovery to which it is entitled.

The other discovery procedure specified in the Hague Convention would allow evidence to be taken by an American diplomatic or consular official in France, or by a commissioner appointed by this court. Since evidence is to be taken from French nationals, prior permission from the Ministry of Justice would be required. SKM argues that this procedure is not available, because evidence taken from it, a party subject to sanctions, technically would be taken under compulsion. After reading the initial round of memoranda, the court requested further briefing on the meaning of "compulsion." Apparently, there is no au-

thority on this point.[10] The stipulation that evidence be taken "without compulsion" quite arguably does not preclude the use of this procedure merely because evidence is to be taken from a party who is subject to sanctions. France's declaration requires that notices to deponents mention "[t]hat appearance is voluntary and failure to appear will not give rise to criminal proceedings in the State of origin." This provision arguably contemplates the possibility of non-criminal sanctions within the context of litigation.

Of course, the court at this point is more concerned with France's interpretation of the Convention, than with its own interpretation of the Convention. SKM states:

The most obvious authority for this point would be the French Ministry of Justice, but SKM is reluctant at this time to contact the appropriate officials on this point because it does not wish to open itself to an allegation that it has influenced the decision by posing the question.

(SKM memo re: compulsion filed 8/19/83, p. 6.) It may be that SKM will be able to supply the court with a more complete record, should the court have to confront this issue in the future. For present purposes, without deciding this difficult question, the court assumes that SKM's position is correct, and that this procedure is not available to enable Graco to obtain discovery from SKM.

RESTATEMENT (SECOND) § 40

■ Concluding for present purposes, then, that at least some aspects of SKM's compliance with Graco's discovery requests would violate the French Blocking Statute, the court turns to the various guidelines and balancing tests which form the basis for its ruling. In applying the general principles set out by the Supreme Court in *Societe*, some courts have adopted the balancing test found in *Restatement (Second)*

§ 40. *E.g., United States v. First National Bank*, 699 F.2d 341 (7th Cir.1983); *In re Westinghouse Electric Corp. Uranium Contracts Litigation*, 563 F.2d 992 (10th Cir.1977); *United States v. First National City Bank*, 396 F.2d 897 (2d Cir.1968). As will be discussed below, this provision addresses international conflicts in general, and is not tailored precisely to conflicts between discovery procedures and blocking statutes. It nonetheless is a useful starting place for the court's analysis.

■ Section 39 provides that the existence of a conflicting foreign law does not deprive a state of jurisdiction to prescribe or enforce laws, but § 40 requires each state to consider moderating its exercise of jurisdiction, "in the light of such factors as":

(a) vital national interests of each of the states,

(b) the extent and the nature of the hardship that inconsistent enforcement actions would impose upon the person,

(c) the extent to which the required conduct is to take place in the territory of the other state,

(d) the nationality of the person,

(e) the extent to which enforcement by action of either state can reasonably be expected to achieve compliance with the rule prescribed by that state.

Each of these factors will be discussed.

(a) *Vital national interests.* The present conflict implicates United States interests of a Constitutional magnitude. Graco alleges infringement of a patent held under the United States patent laws, enacted by Congress under U.S. Const. Art. I, § 8, cl. 8, which states that Congress shall have power:

To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the ex-

---

**10.** In a related context, the Solicitor General has argued that depositions compelled by court order are given under compulsion. Brief for the United States as Amicus Curiae at 10–11 & n. 6, *Volkswagenwerk A.G. v. Falzon, appeal dis-* missed, —— U.S. ——, 104 S.Ct. 1260, 79 L.Ed.2d 668 (1984). The court thanks SKM for supplying it with a copy of the Solicitor General's brief.

clusive Right to their respective Writings and Discoveries.

The United States patent laws rely heavily for their enforcement on private infringement actions by patent holders, and pre-trial discovery, under the Federal Rules of Civil Procedure, is an important part of the system of private enforcement. This does not mean, of course, that every discovery dispute in a patent case is a Constitutional matter; still, inadequate discovery frustrates the purposes of the patent laws and the Constitution. The court also notes that it is just as important to protect United States patents against infringement from foreign sources as against infringement from domestic sources. The limited monopoly which a patent confers may be a positive inducement to infringement by foreign sources, offering increased profits in excess of international shipping costs, if effective enforcement is not anticipated.

As to France's vital interests, it must be remembered that Art. 1-bis of the Blocking statute does not apply only to communications capable of harming France, as does Art. 1. There is no claim or showing that SKM's compliance with Graco's discovery requests would involve communications harmful to France. Also, it is important to distinguish Art. 1-bis from the foreign secrecy laws at issue in *Societe.* Those secrecy laws required financial institutions to maintain secrecy as to certain information about investors, absent a waiver from the investors. Art. 1-bis, on the other hand, does not explicitly aim to maintain the secrecy of any information; it merely prohibits its disclosure in connection with foreign administrative or judicial proceedings. SKM apparently would not violate Art. 1-bis if it voluntarily disclosed the requested information to Graco in the absence of litigation.[11] It is difficult, and possibly somewhat presumptuous, to gauge the importance of the Blocking Statute to France. The court notes that the Blocking Statute, as applicable here, was enacted in 1980; it obviously is not, for instance, an ignored vestige of some bygone era.

(b) *Hardship of inconsistent enforcement.* As noted above, violation of Art. 1-bis is punishable by imprisonment of from two to six months, and by a fine of from 10,000 Francs to 120,000 Francs. Violation of an order of this court can result in a finding of contempt, and sanctions can include a fine, conclusive findings against SKM on certain issues, and a default judgment against SKM. All authorities agree, however, that any sanctions imposed must be moderated according to SKM's good faith in attempting to comply with the court's order.

(c) *Place of performance.* The court assumes, for purposes of this ruling, that at least some portion of SKM's compliance activity would be taken in France, possibly subjecting it to liability under the Blocking Statute. It would seem, however, that most of SKM's activity could be performed outside of France. Documents and interrogatory answers can be turned over to Graco outside of France. Depositions are not at issue on Graco's present motion to compel, but they of course should be taken outside of France, if the Convention procedures prove inadequate. The bulk of SKM's activity need not be performed in France. The court therefore does not believe that in ordering discovery it would be regulating activity occurring primarily in France.[12]

(d) *Nationality.* SKM is a French national.

(e) *Enforcement and compliance.* This portion of the § 40 balancing test asks

---

11. This does not mean, however, that Art. 1-bis is not intended to promote the secrecy of certain information. France may believe that it safely can rely on its nationals to maintain a proper level of secrecy merely by acting in their own perceived interests, but that foreign discovery rules may require them to disclose information contrary to their own perceived interests.

12. As SKM has noted, Art. 1-bis would appear to subject Graco, as well as SKM, to criminal liability. Graco has not made an issue of this potential liability, but it provides another reason for conducting depositions outside France, and for requiring SKM to produce documents and interrogatory answers outside France.

whether a competing regulatory scheme actually regulates the conduct in question, or whether it merely is on the books or otherwise is ineffective. In the context of the present dispute the court must inquire whether France actually enforces Art. 1-bis. This inquiry is relevant not only to determining whether the Blocking Statute actually regulates conduct, but also to assessing the likelihood that SKM will be punished for violating the Blocking Statute.

SKM's showing on the question of enforcement has not been very strong thus far. SKM has been unable to point to a single case in which France enforced its Blocking Statute. SKM has, however, placed in the record an opinion from a French lawyer, Mr. Jean Veil. Veil's letter describes his qualifications, which are not. in dispute, and also discusses the basis for the Blocking Statute. As to its enforcement, Veil states:

> In my capacity of attorney-at-law, I have personally known several cases relating to the application of the legislative text in question; however, the deontological or ethical rules of our professional [*sic*] prohibit me from disclosing these cases in a concrete manner.

(Veil letter of July 28, 1983, p. 1 of translation supplied by SKM.) Veil's opinion, thus stated, is not completely without value to the court. It does not, however, provide a sufficient basis for estimating the regularity with which France enforces its Blocking Statute. SKM also has directed the court's attention to a letter from the French Ministry of Justice to the Office of Foreign Litigation, United States Department of Justice. This letter also provides little basis for gauging the extent of France's enforcement of its Blocking Statute.[13]

In *In re Uranium Antitrust Litigation,* cited above, Judge Marshall held that at least part of the § 40 balancing, which the court has just reviewed, is not appropriate for facts similar to those presented here. Judge Marshall stated:

> Several defendants cited the *Restatement, Second, Foreign Relations Law of the United States,* § 40(a) or rely on broad notions of "international comity" for the proposition that we should balance the vital national interests of the United States and the foreign countries to determine which interests predominate. Aside from the fact that the judiciary has little expertise, or perhaps even authority, to evaluate the economic and social policies of a foreign country, such a balancing test is inherently unworkable in this case. The competing interests here display an irreconcilable conflict on precisely the same plane of national policy. Westinghouse seeks to enforce this nation's antitrust laws against an alleged international marketing arrangement among uranium producers, and to that end has sought documents located in foreign countries where those producers conduct their business. In specific response to this and other related litigation in the American courts, three foreign governments have enacted nondisclosure legislation which is aimed at nullifying the impact of American antitrust legislation by prohibiting access to those same documents. It is simply impossible to judicially "balance" these totally contradictory and mutually negating actions.

480 F.Supp. at 1148. In some important ways, the situation before Judge Marshall differed from that before this court. Some of the laws considered by Judge Marshall apparently were enacted precisely as an attempt to frustrate discovery in the uranium antitrust litigation, and possibly to protect certain defendants not only from discovery, but even from an adverse determination of the merits of the litigation. *See also In re Westinghouse Electric Corporation Uranium Contracts Litigation,*

---

**13.** The text of this letter is reprinted in the appellant's jurisdictional statement filed before the Supreme Court in *Club Mediterranee, S.A. v. Dorin, appeal filed,* 52 U.S.L.W. 3210 (U.S. Sept. 16, 1983) (No. 83–461), which SKM has submitted to this court. The letter describes the Hague Convention procedures as "the only two methods of investigation in French territory that may be ordered by foreign legal authorities." Jurisdictional Statement at 13.

563 F.2d 992, 1000–03 (10th Cir.1977) (Doyle, J., dissenting). Of course, the French Blocking Statute was not enacted to frustrate the present litigation between Graco and SKM. On the other hand, Art. 1-bis shares the reactive quality of the legislation considered by Judge Marshall, in that by its terms it regulates absolutely nothing but compliance with the gathering of evidence for foreign discovery proceedings.

### IN RE URANIUM ANTITRUST LITIGATION TEST

■ Judge Marshall analyzed the problem before him according to three principles culled from *Societe,* acknowledging that the Supreme Court did not intend to set down a universal test to be used in all cases. *Id.* at 1147. Judge Marshall stated:

> *Societe* teaches that the decision whether to exercise that power [to order parties to produce documents subject to foreign nondisclosure laws] is a discretionary one which is informed by three main factors: 1) the importance of the policies underlying the United States statute which forms the basis for the plaintiffs' claims; 2) the importance of the requested documents in illuminating key elements of the claims; and 3) the degree of flexibility in the foreign nation's application of its nondisclosure laws.

*Id.* at 1148. The court already has discussed the first part of this test, the importance of the United States patent laws, in its discussion of § 40. The third part of the test is not considered when the court is determining whether or not to order discovery. Instead, consideration of the foreign state's flexibility should be deferred until such time as the court may have to consider imposing sanctions for failure to comply with the court's order. *Id.* at 1147–48.[14] In discussing § 40, nevertheless, this court has touched upon some questions relevant to this third part of the test. The court turns now to the second part of the test, which considers the importance of the documents or information in question.

In reviewing *Societe* Judge Marshall stated:

> Second, the Court noted that the requested records were "vital" to a determination of the pivotal statutory inquiry, namely whether plaintiff was the captive of enemy interests. The Court thus suggested that the normal discovery standard of whether a document is relevant or is calculated to lead to the discovery of admissible evidence does not apply, and should be replaced by the higher standard of whether the requested documents are crucial to the resolution of a key issue in the litigation.

480 F.Supp. at 1146. SKM has objected to almost all Graco's discovery requests "on the ground that the information sought is not vital or crucial to the resolution of a key issue in the litigation within the meaning of *Uranium.*" (E.g., SKM response to interrogatories filed 5/17/83, p. 8.)

■ Other courts also have recognized that the importance of the requested discovery should be considered under *Societe. United States v. Vetco, Inc.,* 691 F.2d 1281, 1290 (9th Cir.), *cert. denied,* 454 U.S. 1098, 102 S.Ct. 671, 70 L.Ed.2d 639 (1981); *Trade Development Bank v. Continental Insurance Co.,* 469 F.2d 35, 41 (2d Cir.1972). These cases do not suggest, as does the quoted passage from Judge Marshall's opinion, that the discovery requests must meet some exceptionally high standard of relevance; these cases merely indicate that the importance of the documents is a factor to be considered by the court. In addition, Judge Marshall's more extended discussion of this point, 480 F.Supp. at 1154–55, seems to convey a more moderate view than is suggested by his use of the word "crucial." It should be noted that Judge Marshall apparently did not except any documents from his order compelling production, save those over which the parties in question

---

**14.** One case apparently takes the position that *all* consideration of foreign law problems should be deferred until such time as the court may have to impose sanctions. *Arthur Ander-* *son & Co. v. Finesilver,* 546 F.2d 338, 341 (10th Cir.1976), *cert. denied,* 429 U.S. 1096, 97 S.Ct. 1113, 51 L.Ed.2d 543 (1977).

had no control. *See id.* at 1153–54. However the standard is to be articulated, the court recognizes the significance of this factor, and the court sustains certain of SKM's objections on this basis.

RESTATEMENT (REVISED) § 420 (TENTATIVE DRAFT No. 3)

The court has noted above that *Restatement (Second)* § 40 is not tailored specifically to conflicts between foreign laws and discovery requests. Tentative Draft No. 3 for a revised Restatement does devote particular attention to this problem, in its § 420, cited with approval in *United States v. First National Bank*, 699 F.2d 341 (7th Cir.1983). Under § 420, in all cases involving foreign discovery, even in the absence of a conflicting foreign law, the court should consider certain factors. These factors are the importance of the documents or information, the specificity of the request, the origin of the documents, the extent to which the foreign state's interests are implicated, and the possibility of securing the information through alternate means. The court has been careful to consider the importance of the requested information and the specificity of Graco's requests in reviewing the individual interrogatories and requests to produce. The court also has discussed the extent to which important French interests might be implicated. The documents in question presumably originated in France. Graco and SKM have not devoted much attention to the possibility that Graco might find alternative means of securing the information it requests, except with respect to using the procedures of the Hague Convention. The court already has determined that these procedures must be considered inadequate to serve Graco's present discovery need.

When there is a conflicting foreign law, under § 420, a court may enter an order requiring a party to make a good-faith effort to secure permission from foreign authorities to comply with discovery requests. Failure to comply with a discovery order should not be punished with contempt, dismissal, or default, unless the party has failed to make a good-faith effort. On the other hand, issue preclusion may be ordered even if the party has made a good-faith effort to comply with the court's order.

As detailed in the Appendix to this opinion, the court orders SKM to comply with certain of Graco's discovery requests. Should SKM fail to comply with the court's order, the viability of its reliance on the Blocking Statute may depend on whether it has made a reasonable attempt to secure permission from the French authorities. The court does not, however, enter a specific order that SKM seek such permission. In other respects the court is impressed with § 420. In particular, the court notes that a failure to comply with the court's order may give rise to findings of fact adverse to SKM, even if SKM has demonstrated good faith in attempting to comply with the court's order.

RULINGS ON INTERROGATORIES AND REQUESTS TO PRODUCE

The court's rulings are set out in the Appendix to this opinion.

ATTORNEY–CLIENT PRIVILEGE

■ The court's rulings are subject to a successful assertion by SKM of the attorney-client privilege. It is not at all clear that SKM will be able to assert the privilege successfully, as it already has failed in this endeavor twice. When Graco brought its motion to compel, as the court has noted, SKM had not filed any formal response to Graco's discovery requests. On April 4, 1983 the court ordered SKM to file its responses, effectively denying Graco's request that SKM be ordered to respond without objection.

On May 17 SKM filed its responses. Graco's requests to produce and interrogatories had requested that any claim of privilege be supported by some identification of documents claimed to be privileged, but SKM's response omitted any such identification, SKM taking the position that identifying information itself is privileged. At the pre-trial conference of June 15 the court informed SKM that it disagreed with SKM's position, and the court directed

SKM to provide certain identifying information, including the names of all persons receiving copies of the documents in question, as well as some statement of the measures SKM had taken to preserve the confidentiality of the documents.

On August 5 SKM identified the documents as to which it asserts privilege, but it failed to indicate who received copies or what steps had been taken to preserve the confidentiality of the documents. The court's order of June 15, memorializing the pre-trial conference, directed only that SKM identify the documents claimed to be privileged; the order did not spell out what identification SKM should provide. The court therefore will give SKM one more opportunity to perfect its assertion of privilege.

■ Attorney-client privileged can be waived, of course, and it can be waived inadvertently, such as by a failure to assert it properly. *Nye v. Sage Products, Inc.*, 98 F.R.D. 452 (N.D.Ill.1982) (Getzendanner, J.). SKM should assume that this will be its last opportunity to cure the defects in its claim of privilege.

THE HAGUE CONVENTION

■ SKM also has raised an objection based directly on the Hague Convention. The court believes that an order compelling depositions or other discovery proceedings to be conducted in France, but not in accordance with the Convention, might well violate the Convention, or at least be inconsistent with the requirements of international comity, given the availability of the Convention procedures. Of course, the Blocking Statute provides another reason why comity principles might be offended by such an order. As stated above, the court does not order that any proceedings be conducted in France. Whether Ameri-

can courts further are precluded from compelling French defendants to answer written interrogatories currently is before the Supreme Court in *Club Mediterranee, S.A. v. Dorin, appeal filed,* 52 U.S.L.W. 3210 (U.S. Sept. 16, 1983) (No. 83–461). Waiting for a ruling from the Supreme Court could involve considerable delay, and this case already is three years old. Accordingly, the court addresses the question and holds that the Convention does not preclude the court from compelling SKM to answer Graco's written interrogatories and to comply with its document requests.

In late 1983 and early 1984, eleven years after the Convention went into force as a treaty of the United States, and after the parties before this court had briefed the present motion, three federal courts held that interrogatories and document requests ordinarily may not be served upon defendants who are citizens of other states signatory to the Convention, and that Convention procedures must be used exclusively. *General Electric Co. v. North Star International, Inc.,* No. 83 C 0838 (N.D.Ill. Feb. 21, 1984) (Plunkett, J.); *Philadelphia Gear Corp. v. American Pfauter Corp.,* 100 F.R.D. 58 (E.D.Pa.1983); *Schroeder v. Lufthansa German Airlines,* No. 83 C 1928 (N.D.Ill. Sept. 15, 1983) (Kocoras, J.).[15] An earlier federal case held otherwise. *Lasky v. Continental Products Corp.,* 569 F.Supp. 1227 (E.D.Pa.1983). The court in *Lasky* permitted the plaintiffs to serve written interrogatories and document requests on a West German defendant, and the court refused to require the plaintiffs to proceed only under the Convention. This court agrees with *Lasky.*

*Schroeder* and *Philadelphia Gear* relied heavily on two decisions of the California Court of Appeal, which apparently are the only other reported cases confronting the

**15.** These cases were not in complete agreement. *Schroeder* explicitly held that the plaintiff would be required to utilize Convention procedures for all discovery, even that directed at evidence located within the United States. *General Electric* expressly disagreed with this view, holding that the Convention procedures must be used to obtain evidence located in West Germany, or to

question people residing in West Germany. *Philadelphia Gear* apparently involved only evidence located in West Germany. In the present case, Graco seeks discovery of documents located in France, has served interrogatories which apparently can be answered only with information located in France, and seeks to depose residents of France.

**518**

issue. *Pierburg GmbH v. Superior Court*, 137 Cal.App.3d 238, 186 Cal.Rptr. 876 (1982); *Volkswagenwerk A.G. v. Superior Court*, 123 Cal.App.3d 840, 176 Cal. Rptr. 874 (1981). *Volkswagenwerk*, which in retrospect appears as the seminal case in this field, was quite different from the situation presented here or in any of the other reported cases arising under the Convention. In *Volkswagenwerk*, a products liability suit arising out of an automobile accident, the respondent trial court entered a detailed discovery order, providing for on-site inspection of Volkswagen's plant in Wolfsburg, F.R.G. The plaintiffs were to be free to inspect plant records, to photograph the facilities, and to conduct informal discussions with plant employees. In a careful opinion, the Court of Appeal directed the trial court to vacate its order, holding that the plaintiffs should be required to proceed under the Convention, not as a matter of international law, but as a matter of judicial self-restraint. The court's holding apparently may have extended to the plaintiffs' interrogatories and document requests, but the court's primary concern plainly was the on-site discovery proceeding which the trial court had ordered to take place within West Germany, and which, it was predicted by the Court of Appeal, West German authorities would consider a violation of West German judicial sovereignty. The court does not read *Volkswagenwerk* as purporting to govern all cases in which written interrogatories or document requests are served on a West German party.

[11] *Pierburg*, another automobile products liability suit, involved less extreme facts, but surprisingly included much more extreme language. At issue in *Pierburg* were 315 written interrogatories, with subparts, inquiring in great detail as to the design and manufacture of the West German defendant's carburetors. The interrogatories could be answered only by employees residing in West Germany, or by

reference to documents located in West Germany, but the plaintiffs argued that the actual answering of the interrogatories could be performed in the United States, by the defendant's counsel or expert witnesses. The court in *Pierburg* considered it fully dispositive that the defendant was a West German corporation having its principal offices there. The court stated:

> The foundation of the Hague Convention is to honor West Germany's civil law jurisdiction that civil discovery concerning its nationals be conducted within the territory of West Germany. Accordingly, plaintiffs cannot avoid the clear applicability of the Convention by arguing that the Pierburg officers responsible for providing answers to the discovery could leave West Germany to perform the physical act of giving answers.

137 Cal.App.3d at 245, 186 Cal.Rptr. at 881. The court suggested, cryptically, that it might not be possible for the West German defendant to answer written interrogatories in the United States, because "discovery in West Germany might have to be conducted in the form of oral depositions by West German judicial officers." *Id.* The court relied heavily on *Volkswagenwerk* and an earlier case, *Volkswagenwerk A.G. v. Superior Court*, 33 Cal.App.3d 503, 109 Cal.Rptr. 219 (1973), which, like its later namesake, considered a trial court's order that discovery proceedings take place in Wolfsburg, F.R.G.[16] Those cases could have been distinguished on the basis that they involved orders that formal discovery proceedings be conducted within West Germany, while *Pierburg* involved only written interrogatories to a West German defendant. The court obviously was aware of this possible basis for distinguishing the two *Volkswagenwerk* cases, but it felt that to distinguish them on this basis would reduce the Convention to insignificance. The court stated that to allow the plaintiffs to

---

**16.** The first *Volkswagenwerk* case, decided in 1973, referred to the Convention, but it was a pre-Convention case, since West Germany did not ratify the convention until 1979. The *Pier-*burg court mistakenly read the first *Volkswagenwerk* case as construing the United States' obligations under the Convention. 137 Cal. App.3d at 241, 186 Cal.Rptr. at 878.

serve interrogatories on a West German defendant:

> would automatically destroy the Convention in all discovery matters other than those involving physical inspection of the foreign national's property in its state of citizenship. This is not the intendment of the Convention.

137 Cal.App.3d at 245, 186 Cal.Rptr. at 881. This court does not find *Pierburg* to be well-reasoned, and the courts' reliance on *Pierburg* in *Schroeder* and *Philadelphia Gear* weakens those decisions.

*Schroeder, Philadelphia Gear,* and *General Electric* also cite *Pain v. United Technologies Corp.,* 637 F.2d 775, 778–90 (D.C. Cir.1980), *cert. denied,* 454 U.S. 1128, 102 S.Ct. 980, 71 L.Ed.2d 116 (1981). That opinion affirms the dismissal of an action for *forum non conveniens.* In the course of discussing international discovery possibilities, the Court suggests that the Convention procedures would be the only ones available for obtaining certain evidence. This court agrees with the court in *Lasky,* which reads *Pain* as discussing the taking of evidence from a foreign non-party, over whom the court could not obtain jurisdiction. 569 F.Supp. at 1228 n. 1. This observation applies also to a case cited in *General Electric, Hodson v. A.H. Robins Co.,* 528 F.Supp. 809, 820 (E.D.Va.1981), *aff'd,* 715 F.2d 142 (4th Cir.1983). A third case, *Renfield Corp. v. E. Remy Martin & Co.,* 98 F.R.D. 442 (D.Del.1982), includes the

statement that "[t]he parties are not in disagreement that the Hague Evidence Convention governs discovery of any of the documents located in France." *Id.* at 443. The procedural posture of *Renfield* is not clear, however, and it appears most likely that the court and the parties merely were referring to a provision of the Convention in determining whether the French defendant could assert attorney-client privilege under French law, under American law, or both.[17]

SKM has provided the court with law review articles discussing the Convention. Carter, *Existing Rules and Procedures,* 13 Int'l Law. 5 (1979); Note, *Taking Evidence Outside of the United States,* 55 B.U.L. Rev. 368 (1975).[18] The court also has looked at other materials, including the brief but clear discussion in Amram, *The Proposed Convention on the Taking of Evidence Abroad,* 55 A.B.A.J. 651 (1969). This and other articles by Amram are of especial note, because he was a United States delegate to the 1968 Hague Conference, which produced the Convention.[19] Most importantly, the court has examined the text of the Convention.

█ It cannot be denied that foreign displeasure with American discovery procedures played some part in shaping the Convention, but it is a mistake, the court believes, to view the Convention as an international agreement to protect foreign nationals from American discovery when they

---

**17.** If the parties and the court truly were in agreement that the Convention governed discovery of documents located in France, then it is doubtful that the court would have entertained a motion to compel and decide the merits of a privilege claim with respect to those documents. The Convention provides that a person may assert a privilege "[i]n the execution of a Letter of Request." Convention, Article 11. The Convention also provides that a Letter of Request may mention information (presumably privileges applicable under the law of the issuing state) necessary for the executing authority's application of Article 11. Convention, Article 3. A decision on privilege therefore seems to be the province of the executing authority, rather than the issuing court, and it appears that the court in *Renfield* did not intend to suggest that the Letters of Request procedure was being utilized.

**18.** The Toms article on the French Blocking Statute, offered by SKM, also addresses a few comments to the Convention. Interestingly, Toms states that France enacted the Blocking Statute precisely because the Convention does not state that its procedures are exclusive. Toms, 15 Int'l Law. at 586 n. 4, 596–98.

**19.** Amram recommended ratification of the Convention, stating: "It makes no major changes in United States procedure and requires no major changes in United States legislation or rules. On the other front, it will give United States courts and litigants abroad enormous aid by providing an international agreement for the taking of testimony, the absence of which has created barriers to our courts and litigants." 55 A.B.A.J. at 655.

are parties properly before American courts. Two important purposes of an international convention of this type relate to discovery of non-parties, and would justify the Convention's existence regardless of how the Convention is deemed to apply with respect to parties before the court.[20] First, a non-party witness may be willing to be deposed at home, but may be unwilling to travel to the country in which the litigation is proceeding. Since some countries would consider the taking of evidence within their borders a usurpation of judicial prerogative, an international agreement setting up a framework for seeking and granting permission has great value, allowing evidence to be taken without affront to local authorities. Second, an unwilling non-party witness simply cannot be reached, if outside the court's jurisdiction, unless authorities in the witness' state use their authority to compel the giving of evidence. An international agreement provides a framework for the invocation of a foreign authority's compulsory powers, making accessible evidence which otherwise would not have been accessible.[21] A multi-state convention, rather than a series of two-state agreements, confers the added benefit of standardized procedures. Several parties to the Convention were parties to a 1954 convention, Chapter II of which standardized procedures for letters rogatory (or letters of request).[22]

Although no Common Law country had been a party to the 1954 convention, it was intended that Common Law countries would be parties to the 1970 Convention. Various differences between Civil Law practice and Common Law practice had to be reconciled, to bridge the gap between the two systems. For instance, under Civil Law practice an examining judge ordinarily would prepare a summary of a witness' testimony, while the Common Law preference is for a verbatim transcript. *See*, Amram, 55 A.B.A.J. at 652. The first-time participation of the United States, in particular, presented problems because of liberal American discovery practices. One response to the American presence was Article 23, which allows signatory states to declare that their compulsory process may not be invoked, via a Letter of Request, for the purpose of obtaining pre-trial discovery as known in Common Law countries.[23] At the same time, the participation of the United States offered an opportunity for the other participants to attempt to limit American discovery practices which they believed infringed upon their sovereignty.

It is fair to assume that the availability of the Convention procedures was intended to discourage, and possibly to preempt, the taking of evidence within a signatory state's borders without securing local judicial approval or cooperation, whether the evidence is to be taken from a party or a non-party witness. Such an intent would be a manifestation of foreign displeasure with American discovery practices, which may occasionally have included depositions abroad without approval from local authorities. It should be emphasized, though, that the text of the Convention carries no explicit prohibition of alternative methods of taking evidence. In fact, alternative methods ostensibly are preserved by Article 27, which states:

> The provisions of the present Convention shall not prevent a Contracting State from—
>
> * * * * * . *

---

**20.** The court therefore does not share the *Pierburg* court's fear that to allow service of written interrogatories and document requests upon foreign parties "would automatically destroy the Convention." 137 Cal.App.3d at 245, 186 Cal. Rptr. at 881. *See also Schroeder*, slip op. at 5.

**21.** *See, e.g., Sealed Air Corp. v. United States International Trade Comm'n*, 645 F.2d 976, 993 & n. 8 (C.C.P.A.1981) (opinion of Nies, J.).

**22.** Hague Convention on Civil Procedure, March 1, 1954, 286 U.N.T.S. 265, 1 Am.J.Comp.L. 282

(1952) (translation). The 1970 Convention supersedes the 1954 convention (and an earlier 1905 convention) in part. Convention, Articles 29–31.

**23.** Ironically, perhaps, Article 23 was proposed by the United Kingdom, not by a Civil Law country. Amram, 55 A.B.A.J. at 653. Even among Common Law countries, United States discovery procedures are considered extremely liberal.

(c) permitting, by internal law or practice, methods of taking evidence other than those provided for in this Convention.

Whether the Convention was intended to limit intrusive unauthorized discovery proceedings by prohibiting them, or merely by offering an attractive alternative, the court cannot agree that the Convention was intended to protect foreign parties, over whom an American court properly has jurisdiction, from the normal range of pre-trial discovery available under the Federal Rules of Civil Procedure. Nor does the court agree that the Convention requires deference to a country's judicial sovereignty over documents, people, and information—if this really is how judicial sovereignty is to be understood—when they are to be produced in this country. The court in *Lasky* did not engage in a lengthy discussion, but its holding seems to support the conclusion reached here. 569 F.Supp. at 1229. *See also* note 13, *supra.* In this court's view, the critical question is where the evidence-taking proceeding is to be conducted.

 *General Electric* reached a conclusion very similar to the court's view in theory, but very different, the court believes, in its practical effect. In *General Electric* the court stated that protection of the other state's judicial sovereignty was the key question, and the court stated, as this court would agree, that "[a] nation's judicial sovereignty is only threatened, however, when discovery would take place within its borders." *General Electric,* slip op. at 7. The court held, though, that Convention procedures therefore must be used "in obtaining discovery with respect to evidence located (or people residing) in West Germany, but not with respect to evidence located (or people residing) in the United States." *Id.* at 8. This court believes that discovery does not "take place within [a state's] borders" merely because documents to be produced somewhere else are located there. Similarly, discovery should be considered as taking place here, not in another country, when interrogatories are served here, even if the necessary information is located in the other country. The court's view is the same with respect to people residing in another country. If they are subject to the court's jurisdiction, or if the court can compel a party to produce them under Fed.R.Civ.P. 37(d), then the court may order that they be produced for deposition; violation of the other country's judicial sovereignty is avoided by ordering that the deposition take place outside the country.[24]

International commercial litigation involving nationals of signatories to the Convention is not all that infrequent.[25] Such litigation generally does not require the court to order that foreign property be inspected, or that a deposition take place in a foreign country, but interrogatories and document requests, directed at information or evidence located in the foreign country, are a necessary and routine part of almost all these cases. Requiring that such discovery be processed through foreign authorities would work a drastic and very costly change in the handling of this type of litigation. Nothing in the text of the Convention remotely suggests that the Convention was intended to have this wide-ranging effect.

If interpreted as preempting routine interrogatories and document requests, the Convention really would be much more than an agreement on taking evidence abroad, which is what it purports to be. Instead, the Convention would amount to a major regulation of the overall conduct of litigation between nationals of different

---

**24.** It may be that a person to be deposed could avoid the inconvenience of travel to another country by electing voluntarily to appear before a commissioner or diplomatic or consular official under Chapter II of the Convention. The court notes that this order does not compel the taking of any deposition.

**25.** In addition to the United States, the signatories are Barbados, Czechoslovakia, Denmark, Finland, France, the Federal Republic of Germany, Israel, Italy, Luxemburg, the Netherlands, Norway, Portugal, Singapore, Sweden, and the United Kingdom.

signatory states, raising a significant possibility of very serious interference with the jurisdiction of the court in which the litigation is begun. The solicitude for the judicial sovereignty of civil law countries shown in *Schroeder, Philadelphia Gear,* and *Pierburg* apparently is unmatched by any recognition that they are suggesting a startling limitation on the sovereign powers of this country, as expressed through its courts. Treating the Convention procedures as exclusive would make foreign authorities the final arbiters of what evidence may be taken from their nationals, even when those nationals are parties properly within the jurisdiction of an American court. This cession of jurisdiction not only would apply at the discovery stage, presumably, but also would allow foreign authorities to determine what evidence may be taken from their nationals at trial, or for use at trial. An American plaintiff might not be able to call the president of a foreign defendant corporation as a live adverse witness, and instead might have to settle for introducing a transcript of the execution of a Letter of Request abroad. This suggestion may not appear far-fetched when it is remembered that France and West Germany have made declarations under Article 23, apparently stipulating that it is *only* evidence to be used at trial, and not pre-trial discovery, which may be obtained through Letters of Request directed to those countries.

■ Article 23 illustrates well that the text of the Convention is not consistent with the broad interpretation given in *Schroeder, Philadelphia Gear,* and *General Electric,* and that its provisions plainly are inadequate to sustain the burden which this broad interpretation would place upon them. Article 23 states in full:

A Contracting State may at the time of signature, ratification or accession, declare that it will not execute Letters of Request issued for the purpose of obtaining pre-trial discovery of documents as known in Common Law countries.

The United States delegation reported only that: "Article 23 permits a State to refuse to execute a letter, issued to obtain pre-trial discovery of documents." *Report of the United States Delegation to Eleventh Session of Hague Conference on Private International Law,* 8 Int'l Legal Materials 785, 804, 808–09 (1969). Under the court's view, Article 23 allows states to limit the scope of evidence-taking for which they will lend their compulsory powers to foreign courts, but it does not ordinarily give foreign authorities the significant prerogative of determining how much discovery may be taken from their nationals who are litigants before American courts. Under the view apparently taken in *Schroeder, Philadelphia Gear,* and *General Electric,* Article 23 would give foreign authorities this power over the conduct of litigation in American courts. It would be very odd for an international treaty to consider such power a matter for optional, unilateral declaration, as under Article 23. Furthermore, the imprecise and general wording of the permitted declaration is wholly inconsistent with the tremendous importance it would carry under the interpretation given by *Schroeder, Philadelphia Gear,* and *General Electric.*[26] It is conceivable that the United States could enter into a treaty giving the other signatories such great power over American litigation, but a treaty intended to bring about this result surely would state its intention clearly, and surely would be much more precise in setting out such crucial terms.

It might be that *Schroeder, Philadelphia Gear,* and *General Electric* would

---

**26.** Several states apparently felt it necessary to elaborate on their Article 23 declarations, stating, in essence, that they would execute document requests only for specifically identified documents, and that they would not execute interrogatories seeking specific identification of relevant documents. These states are: Denmark, Finland, the Netherlands, Norway, Singapore, Sweden, and the United Kingdom. France, Italy, Luxemburg, and Portugal made the Article 23 declaration without modification, and the Federal Republic of Germany modified the Article 23 language only slightly. Barbados, Czechoslovakia, Israel, and the United States did not make Article 23 declarations.

not really lead to the drastic results imagined here, but the reasons for this are objectionable in themselves. *Philadelphia Gear*, first of all, attaches very little significance to West Germany's declaration under Article 23. This declaration very possibly would involve a limitation on discovery completely unacceptable by the standards of the Federal Rules of Civil Procedure, but *Philadelphia Gear* assumes that West German authorities would consider their declaration to be tempered by an obligation to execute Letters of Request in good faith. 100 F.R.D. at 60–61. This court believes that it would foster antagonism, not mutual cooperation, to suggest to foreign officials that they are acting in bad faith if they do not modify their position as declared under Article 23. Second, *Philadelphia Gear* expressly states that the Convention procedures will be only a first resort, and that recourse subsequently might be had to standard discovery procedures. *Id.* at 60 n. 3, 61. *See also, General Electric*, slip op. at 8. While this suggestion tends to minimize the possible interference with the powers of American courts, it also might tend to offend foreign authorities, rather than encourage a spirit of cooperation. *Philadelphia Gear* clearly is suggesting that foreign officials' rulings, in executing Letters of Request, are subject to being overridden by the issuing court. In other words, if West German authorities did not sufficiently temper their Article 23 declaration by recognizing a duty of good faith, then the court might proceed to order the requested discovery anyway, under the Federal Rules of Civil Procedure. Such a scenario certainly will not be rare if the Convention procedures really are to be used routinely in most or all international commercial lawsuits. In this court's view, the greatest insult to the civil law countries' sovereignty would be for American courts to invoke their judicial aid merely as a first resort, subject to the eventual override of their rulings under the Federal Rules of Civil Procedure. Similarly, the court in *Schroeder* reserves the right to impose sanctions if dissatisfied with the foreign national's compliance with the Letter of Request. *Schroeder*, slip op. at 6. Depending on the circumstances, this might involve an even more offensive second-guessing of the foreign authority's execution of the Letter of Request.

It also should be pointed out that *Schroeder* and *General Electric* purport to base their holdings on principles of international comity, rather than on binding international treaty law, expressly refusing to decide whether the Convention procedures are exclusive of their own force, as a matter of preemptive treaty law. *Schroeder*, slip op. at 4 n. 1; *General Electric*, slip op. at 4. *Philadelphia Gear* does not distinguish clearly between these two possible bases for its decision. 100 F.R.D. at 60 & n. 3. The court notes, first of all, that it has undertaken an extensive examination of the comity problems presented by this case in its discussion of the French Blocking Statute, above, weighing in the balance the availability of the Convention procedures. Moreover, the court doubts that principles of international comity require American courts to go out of their way to include foreign judicial authorities in the administration of lawsuits.

*Philadelphia Gear* cites the Convention's purpose of promoting mutual judicial cooperation, apparently associating this notion also with principles of comity. 100 F.R.D. at 60 & n. 3. International judicial cooperation is, however, or at least should be, an extraordinary measure, employed to protect the sovereign interests of another country when those interests truly are implicated. Trying (or pre-trying) a case in two countries' courts is not a desirable way of handling routine litigation. Involving two judicial systems in a single lawsuit is as likely to disrupt international relations as it is to promote them, especially when the two systems are brought together for discovery purposes. Some of the bitterest disputes center around discovery problems, and the participation of two judges, from different countries, will not necessarily facilitate resolution of discovery disputes. Where the involvement of two judicial systems genuine-

ly is required, of course, it reasonably can be expected that all sides will maintain a spirit of constructive cooperation. Under *Schroeder, Philadelphia Gear,* and *General Electric,* however, two systems would be involved in virtually all international commercial litigation.[27] *Schroeder* states clearly that the Convention "applies whenever foreign nationals are parties to suits; under it plaintiff is *obligated* to request the assistance of that government to obtain discovery." Slip op. at 6 (emphasis in original). Surely this would not be helpful. Either American courts would surrender jurisdiction by treating the decisions of foreign authorities as final and unreviewable, or they would invite endless motions and real international friction by second-guessing those decisions. The court cannot understand why a requirement making such judicial cooperation routine should be inferred from a treaty containing very little language to justify its inference, and the court also does not believe that principles of international comity demand (or are served by) such a requirement.

■ The court therefore concludes that it should not require Graco to proceed only under the Convention in seeking discovery from SKM. The court emphasizes that it is not ordering that any proceeding be conducted within France.

### ISSUES, ISSUE PRECLUSION, AND KREMLIN

In certain of its objections to Graco's discovery requests, SKM purports to define the issues to be tried in this suit. SKM states, for instance:

> With respect to the Convention, an order of this Court to respond without objection to the production request following a refusal to produce by SKM would immediately create a conflict with the Convention as acceded to by France, France's accession to the Convention in-

cluding a declaration to the effect that discovery taken from its citizens would only be for the purpose of obtaining evidence that would be relevant, competent and admissible trial evidence on the issues Graco must prove—ownership of the patent by Graco and infringement of the patent by some as yet unspecified product.

SKM response to requests to produce filed 5/17/83, pp. 7–8.) SKM also states:

> Further objected to on the ground that the information sought is not relevant nor reasonably calculated to lead to the discovery of admissible evidence in the context of domestic litigation since documents referring or relating to areas of research and development of constructions dissimilar to the constructions covered by the patent claims, and the history and development of SKM's commercial products, the public introduction of which precedes any date to which the patent may be entitled, has no possible bearing on the question of infringement of unspecified claims of the patent by as yet unspecified products.

(SKM response to requests to produce filed 5/17/83, p. 8.) SKM's discovery objections are full of similar statements.

■ At first blush, these passages appear to be a stipulation or concession on such issues as validity and willfulness. The court notes that SKM has not raised an affirmative defense of invalidity. In any event, Kremlin has raised an affirmative defense of invalidity. (Kremlin Amended Answer and Counterclaim ¶ 12.) Graco has alleged willful and deliberate infringement, and both defendants have denied this allegation. (Complaint ¶ 9; Kremlin Amended Answer and Counterclaim ¶ 9; SKM Answer ¶ 9.) Validity and willfulness there-

---

**27.** The court in *General Electric* held that Convention procedures are exclusive only with respect to documents or people located or residing in another signatory state. There may be a significant number of international suits in which all evidence to be discovered (and all people to be deposed) are in the United States. Even assuming this number to be quite significant, the court believes that the vast majority of international suits still would require mandatory use of Convention procedures under the rule stated in *General Electric.*

fore are in issue, and there may also be other issues not referred to by SKM.[28]

The court assumes that these issues could be removed from the case by appropriate stipulation. SKM and Kremlin might, for instance, stipulate to the validity of the patent in suit. Another possibility would be for SKM and Kremlin to stipulate that none of SKM's products may be asserted against the patent in suit as prior art. Such a stipulation might remove the need for Graco to conduct extensive discovery concerning most of SKM's products.

Similarly, an appropriate stipulation might remove the issue of willful or deliberate infringement from the case. This issue is relevant to a possible trebling of damages under 35 U.S.C. § 284 and to a possible finding that this is an exceptional case, allowing an award of attorney fees under 35 U.S.C. § 285. *Underwater Devices, Inc. v. Morrison-Knudsen Co.*, 717 F.2d 1380, 1389–90 (Fed.Cir.1983) (§ 284); *Stickle v. Heublein, Inc.*, 716 F.2d 1550, 1564–65 (Fed.Cir.1983) (§ 285). SKM might, for instance, agree to a trebling (or perhaps doubling) of any damages (without, of course, conceding that there will be any liability or damages), and in return Graco might agree to forego an award of attorney fees. It might be possible, under § 285, merely to stipulate that no finding of exceptionality will be sought on the basis of SKM's allegedly infringing activities, since a finding of exceptionality also can be based on the manner in which litigation is conducted. Such a stipulation might remove the need for much of the discovery objected to by SKM.

SKM may wish to give serious consideration to stipulations of this type. If SKM fails to comply with the court's discovery order, then the court may be required to make its own findings of fact adverse to SKM. Fed.R.Civ.P. 37(b)(2)(A). *See Insur-*

ance *Corp. v. Compagnie des Bauxites*, 456 U.S. 694, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982). The court also might bar SKM from introducing certain evidence. Fed.R. Civ.P. 37(b)(2)(B). The court hereby advises Kremlin that it, too, may suffer if, for instance, the court decides to bar use of SKM's products to establish invalidity. None of the parties has discussed this question yet, but Kremlin should be aware that it may be affected directly.

■ Also appearing in SKM's above-quoted objections are references to "unspecified claims" and "unspecified products." These phrases appear several times throughout SKM's objections, and it may be inferred that, at least as of the time SKM filed its responses, SKM was dissatisfied with the extent to which Graco had defined its charge of infringement. The court's recollection is that an informal arrangement was worked out at the pre-trial conference of June 15. Even if this problem has not been resolved completely, SKM has not raised its objection properly, and the court cannot consider it.

■ Similarly, SKM occasionally asserts, without elaboration, that certain of its products antedate the patent in suit. The court obviously cannot sustain any objection based solely on this bald assertion. In any event, such products might be relevant to the validity of the patent in suit, so long as that issue remains in the case.

## GOOD FAITH

In entering an order compelling discovery, the court generally does not discuss at any length the possibility that it may have to impose sanctions; this is because the court assumes that its orders will be followed. Where discovery orders conflict with foreign secrecy or blocking laws,

---

**28.** SKM's position on willfulness apparently is that an increased damage award is not available for two reasons: first, because the patent in suit has not been commercialized, and second, because SKM's products are the result of its own research and development efforts. (Staples letter to Holcomb dated 6/9/83, ex. 2a to Graco's statement filed 6/10/83.) If SKM wished to remove this issue from the case, it could have moved to strike Graco's allegations of deliberate infringement under Fed.R.Civ.P. 12(f), or it could have moved for partial summary judgment under Fed.R.Civ.P. 56. SKM has not asserted its position properly, and the court cannot honor it.

however, courts often do foresee a significant possibility of noncompliance. In this regard the court addresses a few comments to the subject of good faith.

■ The court orders SKM to comply with certain of Graco's discovery requests. This is a court order, and SKM is obligated to comply with it. Failure to comply may result in the imposition of severe sanctions, such as the entry of a default judgment. Such severe sanctions will be perfectly appropriate, unless SKM can convince the court that its failure to comply was not willful. *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976). In the event SKM fails to comply with the court's order, SKM may be able to avoid the most severe types of sanctions by convincing the court that its failure to comply is not willful. It is clear from the case law that the Blocking Statute may provide the basis for a finding that any noncompliance by SKM is not willful. The apparent applicability of the Blocking Statute is not enough, however, to enable SKM to avoid the most severe sanctions:

> Under *Societe*, then, a foreign law's prohibition of discovery is not decisive of the issue. A noncomplying party's good or bad faith is a vital factor to consider.

*SEC v. Banca Della Svizzera Italiana*, 92 F.R.D. 111, 114 (S.D.N.Y.1981). The presence or absence of good faith can be determinative of whether or not severe sanctions will be meted out. *Compare State of Ohio v. Arthur Andersen & Co.*, 570 F.2d 1370 (10th Cir.), *cert. denied*, 439 U.S. 833, 99 S.Ct. 114, 58 L.Ed.2d 129 (1978), *with In re Westinghouse Electric Corp. Uranium Contracts Litigation*, 563 F.2d 992 (10th Cir.1977). SKM may not resist severe sanctions merely by pointing to the Blocking Statute.

■ Should SKM fail to comply with the court's order, and should it attempt to rely on the Blocking Statute in justification, the court will inquire whether SKM is relying on the Blocking Statute in good faith, or whether it has not made a genuine effort to determine whether it might comply with the court's order despite the Blocking Statute. Such a genuine effort might include exploration of several possibilities, such as: securing an exemption from France; complying with as much of the court's order as possible outside the territorial reach of the Blocking Statute; effecting as much compliance as possible under the procedures of the Hague Convention; and providing the court with a firm basis for understanding the manner in which France enforces its Blocking Statute. In listing these factors the court does not intend to limit the range of good-faith activities SKM might undertake, or to hold that those listed would be sufficient to demonstrate good faith.

As to the Hague Convention, the court expects that SKM would contact French authorities and determine whether they would consider SKM to be under "compulsion." SKM also should make a diligent effort to determine what discovery can be effected through a Letter of Request. It may be that most or all of Graco's discovery requests can be handled under that procedure; the conclusions expressed in this opinion are tentative only, and are based solely on the record before the court. It is SKM's obligation to explore this possibility. The court will entertain a properly-supported motion to direct a Letter of Request to France.

SKM so far has failed to obtain any clarification from French authorities, it informs the court, because "it does not wish to open itself to an allegation that it has influenced the decision by posing the question." (SKM memo re: compulsion filed 8/19/83, p. 6.) It is not the court's intention that SKM attempt to comply by deceiving French authorities. SKM may contact the authorities. It may protect itself by trying to agree with Graco on the form and content of any communication; or, if this is not possible, SKM should direct a copy of any such communication to Graco. On a similar note, the court wishes to make clear that any utilization of Hague Convention procedures will be accompanied by an honest representation of the facts to the

French authorities, contrary to what SKM seems possibly to suggest. (SKM memo re: commission filed 3/14/83, p. 10.)

The Blocking Statute is not Graco's problem, and it is not the court's problem; it is SKM's problem. In enacting the Blocking Statute France imposed a serious disability on its nationals. If SKM is unable to comply with the court's order, it runs a real risk of suffering a default judgment or other severe sanctions. Even if SKM can avoid the most severe sanctions, by demonstrating good faith, it still may suffer from findings of fact adverse to it.

## II. GRACO'S MOTION FOR THE ISSUANCE OF A COMMISSION

The court denies Graco's motion for the issuance of a commission. The court does not rule finally that this procedure is not available, but, at this point, the court will not order it over SKM's objection.

In addition to seeking to use the commission procedure to secure compliance with its interrogatories and requests to produce, Graco also seeks to use the commission procedure to take the depositions of Michael Binoche, Gerald Binoche, Henri Perrin, and a Mr. Carpentier. It is not clear whether SKM would argue that any or all of these persons would be under compulsion, barring use of the commission procedures. The Binoches apparently fall within the category of "officer, director, or managing agent of a party," under Fed.R. Civ.P. 37(d), so SKM (and possibly Kremlin) can be required to produce them for deposition pursuant to Fed.R.Civ.P. 30. If the Convention's commissioner procedure is not available, and if a Letter of Request under the Convention would be inadequate, then the Binoches will have to be produced outside of France. The situation may be different with respect to Perrin and Carpentier. Even if the commission procedure may be available, there is no guarantee that Perrin or Carpentier will agree to be deposed. Assuming that neither Perrin nor Carpentier is an officer, director, or managing agent of a party, Letters of Re-

quest may prove to be Graco's only recourse.

The court denies Graco's present motion for the issuance of a commission without prejudice to any party's right to raise the issue again.

## III. CONCLUSION

For the reasons stated above, the court grants in part and denies in part Graco's motion to compel. The court denies without prejudice Graco's motion for the issuance of a commission. Graco's request for costs and fees is taken under advisement; the court's present inclination is to defer consideration of this request until the end of this litigation. A status hearing is set for April 30, 1984, at 9:30 a.m. At that time the court will set deadlines for compliance with the present order, including a short deadline for SKM's perfection of its claim of attorney-client privilege.

It is so ordered.

## APPENDIX

### RULINGS ON INTERROGATORIES AND REQUESTS TO PRODUCE

Graco's discovery requests define "spray coating apparatus" as follows:

As used herein, the term "spray coating apparatus" refers to pneumatically assisted hydraulic spray coating apparatus including a liquid atomizing head for producing a generally fan-shaped liquid film and means for applying air jets for impingement directly or indirectly upon the liquid film.

(Graco's request to produce, p. 2.) Most of Graco's discovery requests use the term "spray coating apparatus," and SKM objects to the definition's coverage of devices employing indirect impingement of air jets. The basis for SKM's objection is that claim 7 of the patent refers to direct impingement, but not to indirect impingement. The court overrules this objection. The court has not yet ruled upon the scope of the claims in the patent, and SKM has

given the court no basis for making such a ruling at present.

*Interrogatory No. 1* asks SKM to identify and provide certain information concerning "spray coating apparatus" made and sold by or for SKM; in addition, unlike the other interrogatories, No. 1 makes the same request concerning "all spray coating apparatus of any kind," obviously including devices not defined as "spray coating apparatus." SKM's response filed May 17, 1983 raised some general relevance objections to No. 1, but it included no timely objection to this broader definition of spray coating apparatus. Subsequently SKM made the untimely argument that this broad request would include not only devices employing both pneumatic and hydraulic principles, as in "spray coating apparatus," but also devices employing only pneumatic or only hydraulic principles. (SKM memo filed 8/5/83, pp. 2–3.) Graco had justified its broader request by noting that such other devices might be asserted against its patent as prior art. (Graco memo re: motion to compel filed 2/8/83, p. 7.) SKM's objection fails to respond to Graco's proffered justification, but instead deplores the breadth of this request and states that such other devices "can have no conceivable relevance to this lawsuit." (SKM memo filed 8/5/83, p. 3.) The court orders SKM to identify all such devices, but the court does not order SKM to respond to parts 1(a) or 1(b) with respect to these devices. Part 1(a) asks when these devices were sold, and part 1(b) asks why any discontinued products were discontinued. The court sustains SKM's relevance objection as to parts 1(a) and 1(b), without prejudice to Graco's right to renew its motion upon a better showing of why this information is necessary. Graco does not move to compel an answer to part 1(c) as to these other devices. (Graco statement filed 6/10/83, p. 4.) With respect to "spray coating apparatus" SKM is ordered to answer No. 1 in full. SKM asserts the irrelevance of "the question of who made a decision to discontinue an obsolete prod-uct" (SKM response to interrogatories filed 5/17/83, p. 5), but the court does not read No. 1 as requesting this information.

*Interrogatory No. 2* asks several questions relating to the development of SKM's "spray coating apparatus," including the identities of those participating in development of the first such device, and whether such persons had knowledge of the patent in suit. SKM objects, apparently, that concepts not embodied in devices actually sold are irrelevant, but the court overrules this objection and orders SKM to answer No. 2.

*Interrogatory No. 3* inquires regarding "spray coating apparatus," not originating with SKM, that SKM may have obtained; part 3(e) asks the identity of any former employees of Graco who work or have worked for the defendants. SKM's response appears to be sufficient, except that it is based on SKM's exclusion from "spray coating apparatus" of devices employing indirect impingement. The court therefore orders SKM to respond again to No. 3. Inasmuch as part 3(e) does not depend on the other parts of No. 3, SKM should state its answer to 3(e) separately.

*Interrogatory No. 4* asks several questions relating to "Defendants' alleged conception and reduction to practice activity" with respect to "spray coating apparatus," focusing mainly on the earliest dates on which certain actions were taken. SKM objects that no one has alleged any conception and reduction to practice activity. The court overrules this objection, understanding Graco's use of "alleged" to be merely a way of avoiding making some kind of admission. SKM also states:

> Further, the range of possibilities which SKM considered in its research and development efforts and its technical reasons for rejecting certain options and accepting others would be disclosed since information is available only in a form which by necessity discloses more than the specifically requested information.

(SKM response to interrogatories filed 5/17/83, p. 11.) This sentence does not provide the court with a sufficient basis for sustaining an objection. The information sought in No. 4 may be important to the

issues of infringement, willfulness, and prior art. Accordingly, the court orders SKM to answer No. 4.

*Interrogatory No. 5* asks several questions regarding testing of SKM's first "spray coating apparatus." The court sustains SKM's relevance objection, without prejudice to Graco's right to renew its motion upon a better showing of why it is necessary to obtain this information.

*Interrogatory No. 6* asks several questions regarding production and marketing of SKM's products, both "spray coating apparatus" and other spray coating apparatus. Part 6(a) asks when, where, in what country, and under whose supervision SKM made its first production run of its first apparatus. The court orders SKM to answer part 6(a). Part 6(b) asks where SKM's apparatus have been manufactured. The court orders SKM to answer part 6(b) only to the extent of stating whether such manufacture has taken place within the United States. Graco has withdrawn part 6(c) for now. (Graco statement filed 6/10/83, p. 4.) Part 6(d) asks when SKM made its first sale of "spray coating apparatus" in the United States. The court orders SKM to answer part 6(d). Parts 6(e) through 6(g) ask questions regarding the first sale, shipment, and advertisement of SKM's "spray coating apparatus." The court orders SKM to answer parts 6(e), 6(f), and 6(g) only with respect to the United States. The court sustains SKM's relevance objection to parts 6(e), 6(f), and 6(g), with respect to countries other than the United States, without prejudice to Graco's right to renew its motion upon a better showing of why this information is necessary. Part 6(h) asks more extensive questions regarding SKM's advertising. The court sustains SKM's relevance objection to part 6(h), without prejudice to Graco's right to renew its motion upon a better showing of why it needs this information. Part 6(i) asks SKM to identify all countries, foreign to the United States, in which SKM's "spray coating apparatus" have been sold. Part 6(j) asks SKM to identify the first and each subsequent different engineering

specification for its first "spray coating apparatus." The court sustains SKM's relevance objection as to parts 6(i) and 6(j), without prejudice to Graco's right to renew its motion upon a better showing of why this information is necessary.

*Interrogatory No. 7* asks in some detail whether SKM ever considered taking a license under the patent in suit or its foreign counterparts, and also inquires regarding the existence of any indemnity agreement respecting the manufacture, use, or sale of SKM's "spray coating apparatus." Graco has withdrawn parts 7(a) through 7(k) for now. (Graco statement filed 6/10/83, p. 4.) Parts 7($l$) through 7($o$) relate to indemnity agreements. SKM makes general relevance objections, but they are not directed specifically at the indemnity inquiries. The court believes that the requested information may be important on the issues of infringement and willfulness. The court orders SKM to answer parts 7($l$), 7(m), 7(n), and 7($o$).

*Interrogatory No. 8* asks several questions concerning SKM's knowledge of the patent in suit. No. 8 asks about legal advice SKM may have received, and about patent searches which may have been performed. The requested information may be important on the issues of infringement and willfulness. The court orders SKM to answer No. 8.

*Request to Produce No. 1* makes several requests for documents, each request excluding routine sales records. Documents requested by part 1(a) relate to forms or models of SKM's "spray coating apparatus"; part 1(b) to the decision or decisions to develop, design, test, construct, form or sell "spray coating apparatus"; part 1(c) to forms or models of other pneumatically-assisted spray coating apparatus; part 1(d) to forms or models of "spray coating apparatus" other than those of SKM. The documents requested by part 1(b) may be of importance on the question of infringement. The court orders SKM to comply fully with part 1(b). The court sustains SKM's relevance objection as to parts 1(a), 1(c), and 1(d), without prejudice to Graco's

right to renew its motion upon a better showing of why these documents are necessary. Part 1(e) requests documents relating to any "spray coating apparatus" similar to those disclosed and claimed in the patent in suit. The court finds part 1(e) too vague and does not order SKM to respond to it, despite SKM's failure to raise this objection. Part 1(f) requests documents relating to any "spray coating apparatus" which defendants believe to be prior art or an anticipation of the claims of the patent in suit. SKM has identified one French patent in response to this request, but suggests that it has responded only with respect to public documents; the court orders SKM to comply fully with part 1(f). Part 1(g) requests documents relating to the patent in suit. The court orders SKM to comply fully with part 1(g). Graco has withdrawn part 1(h) for now. (Graco statement filed 6/10/83, p. 4.) Part 1(i) requests documents relating to opinions with respect to the patent in suit. Although it may be cumulative of part 1(g), the court orders SKM to comply fully with part 1(i). Parts 1(j) and 1(k) request documents relating to SKM's sales and marketing, and to market forecasts and surveys. The court sustains SKM's relevance objection as to parts 1(j) and 1(k), without prejudice to Graco's right to renew its motion upon a better showing of why these documents are necessary. Part 1(*l*) requests documents relating to inventions embodied in SKM's "spray coating apparatus." The court sustains SKM's relevance objection, without prejudice to Graco's right to renew its motion upon a better showing of why these documents are necessary.

*Request to Produce No. 2* requests a representative selection of SKM's sales and promotional literature. The court sustains SKM's relevance objection to No. 2, without prejudice to Graco's right to renew its motion upon a better showing of why these documents are necessary.

*Request to Produce No. 3* requests all documents in SKM's possession relating to "spray coating apparatus" that originated with or were obtained from Graco. SKM has answered that it has no such documents. Since its answer presumably is based on its narrow definition of "spray coating apparatus," the court orders SKM to answer and comply with No. 3 again.

*Description of Physical Things* requests at least one of all forms or models of "spray coating apparatus" and pneumatically assisted hydraulic spray coating apparatus of any kind identified in Requests to Produce No. 1, parts 1(a) through 1(f). The court orders SKM to comply with this request as to parts 1(a), 1(b), 1(c), 1(d), and 1(f).